# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

E. JEAN CARROLL,                                        Civil Action No.:
                                                        22-cv-10016

                              *Plaintiff,*

         – against –

DONALD J. TRUMP,

                              *Defendant.*
---------------------------------------------------------------X

---

### DEFENDANT DONALD J. TRUMP'S  MEMORANDUM OF LAW
### IN SUPPORT OF HIS MOTION FOR A NEW TRIAL OR REMITTITUR

---

TACOPINA, SEIGEL & DeOREO
275 Madison Ave., Fl. 35
New York, New York 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
Counsel for Defendant Donald J. Trump

## TABLE OF CONTENTS

INTRODUCTION..........................................................................................................................1

STATEMENT OF FACTS........................................................................................................3

    THE JURY FOUND THAT PLAINTIFF WAS NOT RAPED BY DEFENDANT................3

    EMOTIONAL HARM FROM THE BERGDORF GOODMAN INCIDENT.........................5

    DEFAMATION DAMAGES....................................................................................................6

ARGUMENT...............................................................................................................................12

    POINT I:       THE COURT SHOULD GRANT A NEW TRIAL OR REMITTITUR
                         PURSUANT TO FED. R. CIV. P. 59............................................................12

          A.       COMPENSATORY DAMAGES FOR THE BATTERY CLAIM................13

          B.       COMPENSATORY DAMAGES FOR THE DEFAMATION CLAIM........16

          C.       PUNITIVE DAMAGES FOR THE DEFAMATION CLAIM.......................22

CONCLUSION............................................................................................................................25

i

# TABLE OF AUTHORITIES

## CASES:

*A.B. v. Staropoli*, No. 08 CIV. 4585 (LMS), 2013 WL 12441525
(S.D.N.Y. Dec. 11, 2013)..................................................................................................15-16

*Abel v. Town Sports Int'l, LLC*, No. 09 CIV. 10388 DF, 2012 WL 6720919
(S.D.N.Y. Dec. 18, 2012)........................................................................................................12

*Alla v. Verkay*, 979 F. Supp. 2d 349 (E.D.N.Y. 2013)................................................................17

*Allen v. CH Energy Grp., Inc.*, 58 A.D.3d 1102 (3d Dep't 2009)..............................................17

*Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34 (2d Cir. 2015)...........................17

*Azkour v. Little Rest Twelve*, No. 10-CV-4132 RJS, 2015 WL 1413620
(S.D.N.Y. Mar. 23, 2015)........................................................................................................12

*Bender v. City of New York*, 78 F.3d 787 (2d Cir. 1996)...........................................................18

*BMW of North America v. Gore*, 517 U.S. 559 (1996).....................................................3, 22, 24

*Cash v. Cnty. of Erie*, 654 F.3d 324 (2d Cir. 2011)...................................................................15

*Casmento v. Volmar Constr., Inc.*, No. 20-CV-00944 (LJL), 2022 WL 15773966
(S.D.N.Y. Oct. 28, 2022)........................................................................................................12

*Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573
(S.D.N.Y. 2011).................................................................................................................17-18, 24

*Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987)......................................16

*Deborah S. v. Diorio*, 153 Misc. 2d 708 (Civ. Ct. 1992).............................................................16

*Doe v. Green*, No. 17CV1765RAOTW, 2021 WL 2188534
(S.D.N.Y. Apr. 29, 2021)........................................................................................................14

*Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306 (S.D.N.Y. 2018).........................................13

*Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, No. 14-CV-3673
(KAM)(JO), 2020 WL 1083771 (E.D.N.Y. Mar. 6, 2020)........................................................23

ii

*Estevez-Yalcin v. The Children's Vill.*, No. 01-CV-8784 KMK, 2007 WL 2746807
(S.D.N.Y. Sept. 20, 2007)...................................................................................16

*Evans v. Metro. Transportation Auth.*, No. 16CV4560FBVMS, 2018 WL 10466833
(E.D.N.Y. Sept. 25, 2018).................................................................................15

*Feldman v. Knack*, 56 Misc. 3d 1209(A), 63 N.Y.S.3d 305
(Sup. Ct. Westchester Co. 2017)......................................................................16

*Feldman v. Knack*, 170 A.D.3d 667 (2d Dep't 2019)..........................................16

*Fisher v. Mermaid Manor Home for Adults, LLC*, No. 14-CV-3461 (WFK)(JO), 2016 WL
7330554 (E.D.N.Y. Dec. 16, 2016)...............................................................23-24

*Grant v. City of Syracuse*, 357 F. Supp. 3d 180 (N.D.N.Y. 2019)...................13-14

*Heller v. Louis Provenzano, Inc.*, 303 A.D.2d 20 (1st Dep't 2003).......................22

*Hurt v. City of New York*, No. 15-CV-7612 (PKC), 2019 WL 5781990
(S.D.N.Y. Nov. 6, 2019)....................................................................................12

*Jalal v. Shanahan*, No. 16-CV-281 (CBA) (LB), 2018 WL 10466837
(E.D.N.Y. May 10, 2018)...............................................................................16-17

*Jester v. Hutt*, 937 F.3d 233 (3d Cir. 2019)........................................................22

*Johnson v. White*, No. 06CIV2540LAPDF, 2010 WL 11586681
(S.D.N.Y. Nov. 18, 2010)...................................................................................15

*Koehler v. Metro. Transportation Auth.*, No. 16-CV-03 (AYS), 2023 WL 2499117
(E.D.N.Y. Mar. 14, 2023)...................................................................................12

*Komatsu v. Ramos*, No. 22-CV-6076 (LTS), 2022 WL 3656323
(S.D.N.Y. Aug. 25, 2022)...................................................................................12

*Laurie Marie M. v. Jeffrey T.M.*, 159 A.D.2d 52 (2d Dep't 1990),
aff'd, 77 N.Y.2d 981 (1991)...............................................................................15

*Lindsey v. Butler*, No. 11-CV-9102 (ER), 2022 WL 17849009
(S.D.N.Y. Dec. 22, 2022)...................................................................................23

*MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546
(S.D.N.Y. 2012)................................................................................................12

iii

*Mathie v. Fries*, 121 F.3d 808 (2d Cir. 1997)................................................................15

*Milfort v. Prevete*, 3 F. Supp. 3d 14 (E.D.N.Y. 2014)....................................................24

*Miller v. State*, 110 A.D.2d 627 (2d Dep't 1985).........................................................16

*Nellis v. Miller*, 101 A.D.2d 1002 (4th Dep't 1984).....................................................17

*Nelson v. Cnty. of Suffolk*, No. 12CV5678DRHAKT, 2019 WL 3976526
(E.D.N.Y. Aug. 22, 2019)..............................................................................................23

*Norris v. New York City Coll. of Tech.*, No. 07-CV-853, 2009 WL 82556
(E.D.N.Y. Jan. 14, 2009)................................................................................................24

*Offei v. Omar*, No. 11 CIV. 4283 SAS MHD, 2012 WL 2086294
(S.D.N.Y. May 18, 2012)...........................................................................................14-15

*Parkin v. Cornell Univ., Inc.*, 182 A.D.2d 850 (3d Dep't 1992)....................................17

*Patterson v. Kummer Dev. Corp.*, 302 A.D.2d 873 (4th Dep't 2003)...........................14

*Perney v. Medical One New York, P.C.*, No. 159080/2019, 2020 WL 8613521
(Sup. Ct. NY Co. Feb. 17, 2020)....................................................................................15

*Phelan v. Loc. 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting
Indus. of U.S. & Canada*, 973 F.2d 1050 (2d Cir. 1992)..............................................18

*Rossignol v. Silvernail*, 185 A.D.2d 497 (3d Dep't 1992)............................................17

*Small v. New York State Dep't of Corr. & Cmty. Supervision*, No. 12-CV-1236S, 2019 WL
1593923 (W.D.N.Y. Apr. 15, 2019)................................................................................23

*Smith v. City of New York*, No. 12 CIV. 8131 JGK, 2014 WL 2575778
(S.D.N.Y. June 9, 2014).................................................................................................12

*Stampf v. Long Island R. Co.*, 761 F.3d 192 (2d Cir. 2014)..................................12-13, 17, 22-23

*Strader v. Ashley*, 61 A.D.3d 1244 (3d Dep't 2009).....................................................17

*Vargas v. Premiere Staff Agency*, No. 17CIV4280VSBHBP, 2019 WL 10632865
(S.D.N.Y. July 18, 2019)...............................................................................................14

*Xiaokang Xu v. Xiaoling Shirley He*, 147 A.D.3d 1223 (3d Dep't 2017)......................17

## **STATUTES/RULES**

C.P.L.R. § 5501(c)....................................................................................................13

Fed. R. App. P. 4.....................................................................................................12

Fed. R. Civ. P. 59 ...........................................................................................1, 12, 25

## INTRODUCTION

Defendant Donald J. Trump ("Trump" or "Defendant"), by and through his undersigned counsel, respectfully submits this Memorandum of Law in support of his Motion for a new trial or remittitur pursuant to Fed. R. Civ. P. 59.

## PRELIMINARY STATEMENT

As argued herein, the Court should order a new trial on damages or grant remittitur because contrary to Plaintiff's claim of rape, the Jury found that she was not raped but was sexually abused by Defendant during the 1995/1996 Bergdorf Goodman incident ("Bergdorf Goodman Incident"). Such abuse could have included groping of Plaintiff's breasts through clothing or similar conduct, which is a far cry from rape. Therefore, an award of $2 million for such conduct, which admittedly did not cause any diagnosed mental injury to Plaintiff, is grossly excessive under the applicable case law.

Furthermore, as set forth below, the $2.7 million compensatory damages award for Plaintiff's defamation claim for the October 12, 2022 Truth Social statement ("October 12, 2022 Statement") was based upon pure speculation. This is so because:

(a) Plaintiff did not prove that the damage to her reputation (if any) was caused by the October 12, 2022 Statement and not by Defendant's June 2019 statements about Plaintiff wherein he denied Plaintiff's allegations ("June 2019 Statements"), which are the subject of *Carroll I*– thus creating a double recovery for Plaintiff to the extent she is awarded any damages in *Carroll I*;

(b) Plaintiff's estimate of how many times the October 12, 2022 Statement was viewed on Truth Social and Twitter was totally unreliable because it incredibly ranged from 1.5 million to 5.7 million times, which is an error rate of 74%;

(c) Plaintiff's evidence as to the amount of people who believed the October 12, 2022

1

Statement (and thus thought less of Plaintiff) was based upon pure conjecture, because (i) according to Plaintiff, the people who read and believed the October 12, 2022 Statement were republicans who consistently believed Defendant, and (ii) such individuals likely would have disbelieved Plaintiff's rape accusation regardless of the October 12, 2022 Statement, especially since Defendant already denied Plaintiff's accusations by way of his June 2019 Statements;

(d)     Plaintiff's proposed reputation repair campaign was based on a speculative premise that Trump supporters would have changed their minds about Plaintiff from such a campaign;

(e)     Readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement, because the people who believed the October 12, 2022 Statement would have already made up their minds about Plaintiff's rape allegation from reading the June 2019 Statements;

(f)     The cost estimate for Plaintiff's proposed reputation repair campaign was based upon pure conjecture in that Plaintiff's reputation expert estimated that it would cost anywhere from $368,000 to $2.7 million, which is an error rate of 86%;

(g)     Plaintiff's reputation expert also testified that she did not analyze any of Plaintiff's numerous media appearances where Plaintiff mitigated any reputational harm from Defendant denying the rape allegation or the vast amount of positive support that Plaintiff received from the public after making her accusation against Defendant; and

(h)     Plaintiff's income has only increased since Defendant denied Plaintiff's accusations, which establishes that she has suffered no financial harm.

Lastly, the punitive damages award for Plaintiff's defamation claim violates the due process

standards set forth in the United States Supreme Court case *BMW of North America v. Gore*, 517 U.S. 559 (1996).

## STATEMENT OF THE FACTS

### The Jury Found that Plaintiff Was Not Raped by Defendant

To Plaintiff, this case was always about Defendant allegedly raping her. Indeed, in her Complaint, Plaintiff refers to the incident with Defendant as a "rape" dozens of times. *See* Complaint (Exhibit A[1]) at ¶ 1 (Defendant "forced her up against a dressing room wall, pinned her in place with his shoulder, and raped her."); ¶ 4 ("And she knew that while a woman who accused any man of rape was rarely believed, a woman who accused a rich, famous, violent man of rape would probably lose everything. She therefore reasonably concluded that if she accused Donald Trump of rape he would bury her in threats and lawsuits, and she would probably lose her reputation, not to mention everything she had worked for and achieved."); ¶ 9 ("She decided to describe Trump's rape in a book ...."); ¶ 10 ("He denied the rape."); *see also id.* at ¶¶ 44, 46, 49, 51, 53, 55, 59, 63-64, 68, 69, 70, 76, 78, 80, 87, 96-98, 102, 106-108, 110, 115, 118-119, 122-123, and 125.

Similarly, during trial, Carroll consistently referred to the Bergdorf Goodman Incident as nothing less than a "rape." *See, e.g.,* Tr.[2] at 148:8 ("I am here because Donald Trump raped me."); 216:2 ("Donald Trump raped me."); 233:1-2 ("Q. Why did you think he was evil? | A. Because he raped me."); 318:22-23 ("getting attention for being raped is not -- it's hard"); 334:10 ("Not supposedly. I was raped."); 334: 15-17 ("Q. That's your version, right, Ms. Carroll, that you were raped? | A. Those are the facts."); 408:9-10 ("I'm telling you, he raped me, whether I screamed or not.").

---

[1] All Exhibit references herein refer to the Exhibits attached to the accompanying Declaration of Matthew G. DeOreo.

[2] "Tr." refers to the Trial Transcript. Relevant portions of the Trial Transcript are attached to the DeOreo Declaration as Exhibit B.

The same holds true for Plaintiff's opening and summation. *See* Tr. 31:12-13 ("forced his penis inside her"); 34:22-23 ("You will hear that Ms. Birnbach told Ms. Carroll, in no uncertain terms, E. Jean, you have been raped."); 1242:8 ("Trump then removed his hand and shoved his penis inside her."); 1243:3-7 ("Ms. Birnbach told you that upon hearing what had happened, she left the kitchen so her kids wouldn't be able to overhear her, and told Ms. Carroll, in no uncertain terms, E. Jean you have been raped."); 1249:22-25 ("Remember when Mr. Trump's lawyers asked Dr. Lebowitz whether or not screaming would be consistent with a rape? Here is what she said. She said that not screaming would not only be absolutely consistent with being raped ...."); 1251:22-23 ("Dr. Lebowitz also testified to you about how Ms. Carroll processed the rape ...."); 1258:18-20 ("[D]id you see anything suggesting that they all agreed to come up with a lie that Donald Trump raped E. Jean Carroll."); 1283:3-6 ("And there is no greater service that a citizen can do in this country than what you are being asked to do now, consider whether an accusation as heinous as a claim of rape has merit."); 1389:19-21 ("It is weird that Ms. Carroll told her friend she had been raped and her friend never asked about it again for 20 years. The truth is often weird."); 1396:22-23 ("If someone accused you of rape and you didn't do it, you would run to the courtroom ...."); 1397:7-8 ("And you should draw the conclusion that that's because he did it, because he raped Ms. Carroll ...."); 1400:19-20 ("Ms. Birnbach wouldn't have interviewed Trump had she just been told that he had raped her friend ...."); 1405:19-20 ("Is the defense saying that because Ms. Carroll was raped she could never be happy again?"); 1407:1-2 ("[I]t feels like the defense has this idea of the perfect rape victim ....").

However, the Jury found that Defendant did not rape Plaintiff but that Defendant "sexually abuse[d]" Plaintiff, which, according to the Court's jury instructions, could have been a groping of her breasts through the clothes. (Tr. 1418:3 - 1419:8; 1472:17-18).

In other words, the Jury simply did not believe Plaintiff's rape accusation.

**Emotional Harm from the Bergdorf Goodman Incident**

Plaintiff testified that she has suffered no diagnosed injury from the Bergdorf Goodman Incident, has been happy since the incident and described her life as "fabulous":

Q. Have you ever been diagnosed with any mental health conditions such as PTSD or depression?

A. No.

***

Q. Are you a happy person, Ms. Carroll?

A. I am a happy person. I know it seems strange to hear me after today, but I'm basically a happy person.

***

Q. During that podcast, you confirmed or you stated that your life had been fabulous since the book came out.

A. I always say my life is fabulous. No matter who asks me, what time of day, I will always reply it's fabulous.

(Tr. 225:8-16; 551:11-14; *see also* 270:20 - 271:2; 551:17 - 552:9; 645:20 - 646:12).

Plaintiff also testified that before publically accusing Defendant of rape in her book, she was "as good as new. This is great. I'm fine. I rarely think of it. *** I'm fine. I rarely think of it." (Tr. 610:3-9; 610:17-611:1).

Plaintiff's emotional harm expert, Dr. Leslie Lebowitz, similarly testified that Plaintiff did not suffer from any "thought disorder, character disorder, or major mental illness. She struck me as unusually vivacious and extroverted." (Tr. 835:5-11). Dr. Lebowitz also did not diagnose Plaintiff with post-traumatic stress disorder ("PTSD"), anxiety, or major depression and testified that Plaintiff is a "extremely resilient person." (Tr. 853:8-10; 880:6-14; *see also* 907:15-20; 918:12 - 919:5; 946:14 -

5

947:5). Dr. Lebowitz also testified that Plaintiff's lack of romantic partners could have been caused by "something else other than the alleged Bergdorf Goodman incident ...." (Tr. 925:10-17).

## Defamation Damages

The crux of Plaintiff's defamation claim was that Trump allegedly defamed Plaintiff when he denied raping her. *See* Complaint (Exhibit A) at ¶¶ 96 & 98 ("In the October 12 statement, Trump falsely stated that he did not rape Carroll. *** In the October 12 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a "hoax," "scam," or ploy to increase her book sales."); Tr. 320:21 - 321:21. As noted above, the Jury found that Defendant did not rape Plaintiff, and thus, the portions of the defamation claim based upon an alleged rape failed.

Plaintiff also testified that Trump defamed her when he denied the Bergdorf Goodman Incident in his June 2019 Statements, damages for which were not part of this trial as they are the subject of *Carroll I*. *See Carroll I* Complaint (Exhibit C); Tr. at pp. 262-270. However, Plaintiff testified that she was greatly harmed by the June 2019 Statements, including the loss of her reputation and job at Elle magazine, and also because she allegedly received death threats due to the June 2019 Statements, which caused her to purchase bullets for her gun for protection:

Q. What happened after -- what happened to you after Mr. Trump made those statements?

A. People have gone through much worse than being reviled by president Trump for three days, much worse. I understand that. But, boy, it hit me and it laid me low because I lost -- I lost my reputation. Nobody looked at me the same. It was gone. Even people who knew me would look at me with, you know, pity in their eyes and the people who had no opinion now thought I was a liar and hated me. Oh my God. The force of hatred coming at me was staggering.

Q. How did it -- how did that hatred, how did it come at you? In what form?

A. People telling me they are reading about it on the Internet, am I E. Jean Carroll; opening up my e-mail and seeing threats against my life; opening up my Ask E. Jean

6

letters which are generally -- you know, it's my lifeline, it gives me spirit, reading Ask E. Jean, and they are saying terrible things to me.

Q. .... How many messages sort of threatening you physically did you receive?

A. Not a lot, but serious threats, around ten.

Q. What was your reaction to receiving in particular those threatening messages?

A. I bought bullets for a gun that I owned.

                        \*\*\*

Q. Okay. How, if at all, do you believe that Mr. Trump's June 2019 statements have affected your reputation?

A. I am no longer believed. I got fired. I lost my readers. I lost eight million readers. My magazine work has suffered. The number of letters I receive has gone down. I am still in their swinging. I've still got my Ask E. Jean column on Substack, and I have got 19,000 readers. But it's been a huge loss, and I'm slowly building it back.

(Tr. 268:20 - 269:19; 271:10-17; *see also* Tr. at 271:18 - 273:10).

However, Plaintiff never distinguished the harm caused by the June 2019 Statements and the October 12, 2022 Statement. Therefore, the jury award for the purported harm caused by the October 12, 2022 Statement is based upon pure speculation, and the jury very clearly must have awarded Plaintiff compensatory damages for the alleged harms caused by the June 2019 Statements, namely the alleged loss of reputation and her job, as well as receiving death threats.

Moreover, Plaintiff's reputation expert, Professor Ashlee Humphreys, testified about the purported harm caused by Defendant's June 2019 Statements:

Q. Why did you look at material that was published or written about Ms. Carroll prior to June 2019?

A. So, in June 2019 Mr. Trump made a series of statements that impacted her reputation and I felt it was important to account for some of that change prior to October 12th.

Q. Can you describe what you observed about Ms. Carroll's reputation prior to June 2019 as compared to after June 2019?

A. So, when I looked at the materials from before June 2019, that means I looked at reviews of her books, media coverage of her, even Amazon reviews of her books that were before that, just reader responses to it. I kind of first got a glimpse of that and found, you know, she was known as kind of like a sassy dating advice columnist, a real truth-teller a journalist, who gave trusted advice on dating and living in the city. And then after, I looked at the social media posts from June through October, and then I looked at media posts from after October.

Q. And you described Ms. Carroll's reputation prior to June 2019. How did that compare to the reputation that you observed after, immediately after June 2019?

A. So, after June 2019, you know, of course there was a lot more volume of statements about her and they contained pretty negative associations including that she was a liar, the perpetrator of a scam, a hoax. Things like that.

(Tr. 1129:15 - 1130:12).

Additionally, Professor Humphreys compared Plaintiff's reputation before the June 2019 Statements and after the October 12, 2022 Statement, and thus Professor Humphreys necessarily included the purported harm from the June 2019 Statements into her damages analysis:

So, one thing in my analysis that I noticed is, prior to the June 2019 statement, there were, of course, many positive associations of her but the volume was relatively small. After the October 12 statement there was a huge volume of associations associated with her, some of those were positive, but then a huge volume, a very large number, tens of thousands of those associations were really negative.

(Tr. 1135:2-8).

During summation, Plaintiff argued to the Jurors that they should look to Professor Humphreys's testimony when deciding the amount to award for reputational harm for Defendant's "public statements," which necessarily includes the June 2019 Statements for the reasons stated above:

So what is the level of damages? I'm not going to stand here and tell you exactly how much you should award E. Jean Carroll in damages, but there are a few things that you can consider in coming to that conclusion.

First of all, Professor Humphreys told you about the millions of people that heard and likely believed Donald Trump's public statements about E. Jean Carroll. What is the price for having to live your life in shame and to lose your good name because Donald Trump lied and told millions of people that you are a liar?

8

(Tr. 1272: 8-17). Consequently, the jury's speculative award for reputational harm created a double recovery for Plaintiff to the extent she is awarded any damages in *Carroll I*.

Professor Humphreys also testified that her analysis was so uncertain that she could not narrow her estimate as to how many times the October 12, 2022 Statement was viewed on Truth Social and Twitter to anything more specific than somewhere "between 1.5 million and 5.7 million times," which is an error rate of 74%. (Tr. 1125:17 - 1126:8).

Professor Humphreys then testified that the people who read and believed the October 12, 2022 Statement were "republicans [who] typically believe Mr. Trump." (Tr. 1133:18 - 1134:4). Those persons likely would not have had a high opinion of Plaintiff regardless of the October 12, 2022 Statement, because Plaintiff was attacking a political figure that they highly favored. Consequently, Professor Humphreys did not take into consideration the fact that Trump's supporters likely would never have supported or believed Plaintiff regardless of Trump's response to her rape accusation, and that Plaintiff's reputation with such supporters would not have changed due to the October 12, 2022 Statement. This is especially so because Defendant already denied Plaintiff's accusations by way of his June 2019 Statements.

Moreover, Professor Humphreys testified that in order to repair Plaintiff's reputation with such Trump supporters, Plaintiff would have to pay for the cost of a reputation repair campaign, which is "a campaign to put out positive messages about" Plaintiff. (Tr. 1136:1-13; 1136:25 - 1137:6). However, Professor Humphreys did not explain how existing Trump supporters would have changed their minds about Plaintiff due to positive messages about Plaintiff, especially since Defendant already denied Plaintiff's allegations in the June 2019 Statements. In fact, Professor Humphreys testified that she has never even done a reputation repair campaign before, so her analysis on this subject should be given little weight. (Tr. 1136:14-16).

9

Professor Humphreys further testified that the June 2019 Statements already existed as of the October 12, 2022 Statement, and that readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement. (Tr. 1149:2 - 1150:3). She also testified that she does not know if the people who believed the October 12, 2022 Statement had already made up their minds about Plaintiff's rape allegation from reading the June 2019 Statements. (Tr. 1150:4-19).

Therefore, Professor Humphreys's testimony about changing the minds of Trump supporters (the target of the reputation repair campaign) is pure speculation. It is not surprising then that her cost estimate for such a campaign was equally based upon pure conjecture in that she estimated that it would cost anywhere from $368,000 to $2.7 million (Tr. 1139:20 - 1141:21), which is an error rate of 86 percent.

Professor Humphreys also testified that she did not analyze any of Plaintiff's numerous media appearances where Plaintiff mitigated any reputational harm from Defendant denying Plaintiff's allegations. (Tr. 1148:8 -19; 1152:13- 1153:11).

In this regard, Plaintiff herself testified that she received a vast amount of positive support from the public after making her accusation against Defendant:

Q: After your article appeared in The Cut, that's again the first time the story appeared publicly?

A: Yes.

Q: You received a lot of positive letters?

A: Yes.

(Tr. 568:21-25; *see also* Tr. 270:4-14; 552:15 - 553:2).

Importantly, Professor Humphreys conceded the positive support that Plaintiff received on social media after the rape allegation but did not factor such support into her analysis of the harm allegedly caused by the October 12, 2022 Statement. (Tr. 1154:3-13). Accordingly, if the positive social media posts about Plaintiff far outweighed the negative posts, Professor Humphreys did not measure that. (*Id.*).

Plaintiff also testified that her income increased since leaving Elle magazine due to her business with Substack[3]:

> Q:      Well, how would you compare financially. How much were you making your last year at Elle versus what you are making now at Substack?
>
> A:      Well, because I worked - because the Elle column was published once a month and I received $5,000 a month, I think it was $5,000? Yeah, $5,000 a month. And now I turn out three columns every week, so I am doing, I don't know, ten times the work and I still manage to have about the same income.
>
> Q:      Might it be a little more?
>
> A:      Slightly more, yeah

(Tr. 272:21 - 273:5; *see also* 317:12-21; 547:15-19; 550:2-5). Furthermore, Plaintiff never argued lost income to the Jury. Therefore, there can be no credible dispute that Plaintiff did not suffer any financial harm from the October 12, 2022 Statement, and Professor Humphreys did not factor that into her analysis.

---

[3] "Substack is a way for writers to reach their audience, their readers, directly through newsletters." (Tr. 272:11-13).

# ARGUMENT

## POINT I

### THE COURT SHOULD GRANT A NEW TRIAL OR REMITTITUR PURSUANT TO FED. R. CIV. P. 59[4]

Remittitur or a new trial is appropriate where a jury's award is "entirely out of proportion to the

plaintiff's injury [and was] motivated by sympathy rather than by evidence of harm." *MacMillan v.*

*Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 560-61 (S.D.N.Y. 2012) (citing *Mendez v. Starwood*

*Hotels & Resorts Worldwide, Inc.,* 746 F. Supp. 2d 575 (S.D.N.Y. 2010)). Whether a jury's award is

excessive is a question of law for the Court to decide. *See, e.g., Koehler v. Metro. Transportation Auth.*,

No. 16-CV-03 (AYS), 2023 WL 2499117, at *15 (E.D.N.Y. Mar. 14, 2023).[5]

"Remittitur is the process by which a court compels a plaintiff to choose between reduction of

an excessive verdict and a new trial." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014)

"'A federal court, in reviewing the amount of damages awarded on a state law claim, must apply

New York law.'" *Hurt v. City of New York*, No. 15-CV-7612 (PKC), 2019 WL 5781990, at *11

(S.D.N.Y. Nov. 6, 2019)(quoting *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006)). "Under

---

[4] Even though Defendant already filed his Notice of Appeal, this Court still has jurisdiction to decide this motion. *See Komatsu v. Ramos*, No. 22-CV-6076 (LTS), 2022 WL 3656323, at *1 n. 1 (S.D.N.Y. Aug. 25, 2022)("Rule 4 of the Federal Rules of Appellate Procedure ... provides that, if a plaintiff files a Rule 59 or Rule 60 motion within 28 days after entry of judgment, a notice of appeal does not become effective until the district court disposes of the motion, even if the notice of appeal was filed first. *See* Fed. R. App. P. 4(a)(4)(B)(i). The Court therefore has jurisdiction to consider Plaintiff's motion."); *Azkour v. Little Rest Twelve*, No. 10-CV-4132 RJS, 2015 WL 1413620, at *1 (S.D.N.Y. Mar. 23, 2015)(holding same); *Smith v. City of New York*, No. 12 CIV. 8131 JGK, 2014 WL 2575778, at *1 n.1 (S.D.N.Y. June 9, 2014)(holding same).

[5] "Rule 59, not Rule 50, is the proper vehicle for motions to reduce damage awards ...." *Casmento v. Volmar Constr., Inc.*, No. 20-CV-00944 (LJL), 2022 WL 15773966, at *9 n. 5 (S.D.N.Y. Oct. 28, 2022)(citing cases); *see also Abel v. Town Sports Int'l, LLC*, No. 09 CIV. 10388 DF, 2012 WL 6720919, at *35 (S.D.N.Y. Dec. 18, 2012)("Defendant's further alternative motion under Rule 59(e) for remittitur is granted.").

New York law, a court 'shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.'" *Stampf*, 761 F.3d at 204 (quoting C.P.L.R. § 5501(c)).

"This standard requires a more exacting review than the 'shocks the conscience' standard generally applied by federal courts, and is less deferential to a jury verdict." *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018)(quotations omitted). Moreover, in "determining whether an award deviates materially from what would be reasonable compensation, district courts compare the jury's award to awards allowed in analogous cases involving similar types of injuries." *Id.* (quotations omitted).

**A.** **Compensatory Damages for the Battery Claim**

In summation, Plaintiff argued that she should be compensated for living a life since early 1996 without companionship: "What is the price for decades of living alone without companionship, for having no one to cook dinner with, no one to walk your dog with, no one to watch TV with, and for feeling for decades like you are dirty and unworthy?" (Tr. 1272:22 - 1273:1).

Therefore, Plaintiff was seeking damages for loss of consortium, which "includes such items as loss of support services, companionship, society, sexual relations, and solace." *Grant v. City of Syracuse*, 357 F. Supp. 3d 180, 195 (N.D.N.Y. 2019). According to New York law, such awards should "fall within a 'low six-figure range'":

> A review of comparable awards shows that such awards often fall within a "low six-figure range". *Okraynets v. Metropolitan Transp. Authority*, 555 F.Supp.2d 420, 440 (S.D.N.Y. 2008); *see also Walsh v. State of New York*, 232 A.D.2d 939, 648 N.Y.S.2d 816 (1996) (upholding a $ 185,000 on a wife's derivative claim); *DeLeonibus v. Scognamillo*, 238 A.D.2d 301, 656 N.Y.S.2d 275 (1997) (upholding a $ 275,000 loss of consortium claim); *Kirby v. Turner Constr. Co.*, 286 A.D.2d 618, 730 N.Y.S.2d 314 (2001) (reducing a $700,000 jury award for loss of consortium to $300,000); *Kirschhoffer v. Van Dyke*, 173 A.D.2d 7, 577 N.Y.S.2d 512 (1991) (reducing a $ 1.8 million jury award for loss of consortium to $ 400,000).

13

*Grant*, 357 F. Supp. 3d at 196; *see also Patterson v. Kummer Dev. Corp.*, 302 A.D.2d 873, 874 (4th

Dep't 2003)(awarding plaintiff's wife $260,000 for loss of society and companionship).

An award in the "low six-figure range" is also consistent with awards in favor of plaintiffs

whose intimate parts were groped by a defendant, which is what the jury decided happened in this case.

*See Doe v. Green*, No. 17CV1765RAOTW, 2021 WL 2188534, at *2 (S.D.N.Y. Apr. 29, 2021)(Award

of $350,000 for the following sexual assault: "Green entered Plaintiff's cell alone—the door had

remained open—and assaulted her by grabbing, pushing, and restraining her against her cell wall;

kissing, biting, and licking Plaintiff's upper body, including her exposed breasts; and putting his hand

down Plaintiff's shorts and fondling her genitalia and groin."), report and recommendation adopted,

2021 WL 2188148 (S.D.N.Y. May 28, 2021); *Vargas v. Premiere Staff Agency*, No.

17CIV4280VSBHBP, 2019 WL 10632865, at *2 (S.D.N.Y. July 18, 2019)(Award of $30,000 for the

following sexual assault: "As plaintiff was changing, Guzman came back into the locker room and put

his hand down plaintiff's pants and groped her vagina and buttocks. When plaintiff pushed Guzman

away, Guzman then grabbed her and forcefully groped her breasts and tried to kiss her."), report and

recommendation adopted sub nom., 2020 WL 5663412 (S.D.N.Y. Sept. 23, 2020); *Offei v. Omar*, No.

11 CIV. 4283 SAS MHD, 2012 WL 2086294, at *1 (S.D.N.Y. May 18, 2012)(Award of $250,000 for

the following sexual assault: "Mr. Omar announced 'oh Doris, I like you' and proceeded to seize her

in a bear hug, kiss her on the lips and the neck, squeeze her breasts and rub his clothed penis against

her. Ms. Offei asked him to stop, telling him that she was a married woman, and that she had come to

the room only to deliver the tissue boxes. As she tried to escape, he blocked her way and grabbed her

again from behind, once more kissing her and seizing her breasts. She pleaded with him to leave her

alone, but he persisted for at least a brief period, urging her to give him her phone number so that they

could 'text,' and squeezing her buttocks as she headed for the door."), report and recommendation

adopted, 2012 WL 2086356 (S.D.N.Y. June 8, 2012); *Johnson v. White*, No. 06CIV2540LAPDF, 2010 WL 11586681, at *1–2 (S.D.N.Y. Nov. 18, 2010)(Award of $25,000 for the following sexual assaults: "White placed her hands on Plaintiff's 'groin,' made derogatory comments about the size of Plaintiff's penis, and requested that they spend the weekend together and that Plaintiff have sex with her. **** White 'squeezed on Plaintiff's button' and stated that Plaintiff was going to be forced to have sex with her. *** White unzipped his pants, pulled out his penis, and asked him if she could suck on it. *** White allegedly fondled his 'button,' showed him her underwear, and told him to put his hand down her pants to smell her odor.*** White allegedly grabbed Plaintiff's 'groin area' and threatened to have him sent back to prison if he complained again to her supervisor."); *Laurie Marie M. v. Jeffrey T.M.*, 159 A.D.2d 52, 54 (2d Dep't 1990), aff'd, 77 N.Y.2d 981 (1991)(Award of $100,000 for the following sexual assault: "The defendant admitted rubbing and touching the plaintiff's breasts and genital area and having her rub and touch his genitals."); *Evans v. Metro. Transportation Auth.*, No. 16CV4560FBVMS, 2018 WL 10466833, at *1 (E.D.N.Y. Sept. 25, 2018)($25,000 award for "unwelcome comments of a sexual nature, rubb[ing] [of] groin against [plaintiff's] leg, and grop[ing] [of] her breasts"); *Perney v. Medical One New York, P.C.*, No. 159080/2019, 2020 WL 8613521, at *4 (Sup. Ct. NY Co. Feb. 17, 2020)(award of $100,000 for the fondling of genitalia).

Furthermore, a $2 million award for the groping of intimate parts is far more than New York juries or courts have awarded victims of rape (including children raped by adults multiple times) who have suffered significant diagnosed injuries, such as PTSD. *See Cash v. Cnty. of Erie*, 654 F.3d 324, 328 (2d Cir. 2011)(Awarding $500,000 to plaintiff who was forcibly raped in confinement by sheriff's deputy); *Mathie v. Fries*, 121 F.3d 808, 810–11 (2d Cir. 1997)(Awarded $250,000 to a former inmate who was handcuffed to a pipe and forcibly raped by a corrections officer); *A.B. v. Staropoli*, No. 08 CIV. 4585 (LMS), 2013 WL 12441525, at *7 (S.D.N.Y. Dec. 11, 2013)(Awarding minor plaintiff

$600,000 for repeatedly being raped by soccer coach over for two years and suffering from anxiety, depression, and a severe eating disorder); *Estevez-Yalcin v. The Children's Vill.*, No. 01-CV-8784 KMK, 2007 WL 2746807, at *3 (S.D.N.Y. Sept. 20, 2007)(Awarding $500,000 each to two plaintiffs who were forcibly raped as young boys by an adult causing one plaintiff to have a "prognosis [that was] extremely poor with a high risk that he will harm others or will himself be incarcerated" and the other to suffer "significant psychological distress ... requiring intensive and long term psychotherapy with a mental health professional."); *Feldman v. Knack*, 170 A.D.3d 667, 667 (2d Dep't 2019)(Awarding $450,000 to plaintiff who was forcibly raped by her psychotherapist and suffered from post traumatic stress disorder and depressive disorder )[6]; *Miller v. State*, 110 A.D.2d 627 (2d Dep't 1985)(Awarding $400,000 to student who was raped in her dormitory); *Deborah S. v. Diorio*, 153 Misc. 2d 708, 716 (Civ. Ct. 1992)(Awarding $100,000 to plaintiff who was raped at knife point for one to two hours), aff'd, 160 Misc. 2d 210 (App. Term 1994).

Therefore, the Jury's $2 million award was clearly motivated by sympathy rather than by evidence of harm, and the Court should grant a new trial as to compensatory damages for the battery claim, or grant a remittitur of such award to an amount no more than $400,000.

**B.**   **Compensatory Damages for the Defamation Claim**

New York courts have consistently held that compensatory damages awards of $100,000 or less for defamation claims are appropriate. *See Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987)(affirming jury award of $15,000 for injury to reputation for magazine publishing a defamatory statement that plaintiff was offering sexual favors to the public); *Jalal v. Shanahan*, No. 16-CV-281 (CBA) (LB), 2018 WL 10466837, at *6 (E.D.N.Y. May 10, 2018)(Awarded $10,970 in compensatory damages for tenant making false accusations on television that landlord was promiscuous

---

[6] *See also Feldman v. Knack*, 56 Misc. 3d 1209(A), 63 N.Y.S.3d 305 (Sup. Ct. Westchester Co. 2017).

and unchaste and harassed tenant and stole $400,000 of tenant's property); *Xiaokang Xu v. Xiaoling Shirley He*, 147 A.D.3d 1223, 1224 (3d Dep't 2017)(Award of $5,000 in compensatory damages for defendant making online postings falsely accusing plaintiff of abuse, cruel and inhumane treatment, theft of trade secrets, fraud and perjury); *Allen v. CH Energy Grp., Inc.*, 58 A.D.3d 1102, 1104 (3d Dep't 2009)(Award of compensatory damages of $50,000 for defendant falsely accusing plaintiff of defecating on the sidewalk, which led to his loss of employment); *Strader v. Ashley*, 61 A.D.3d 1244, 1247 (3d Dep't 2009)(Award of $26,800 for defendant falsely accusing plaintiff of theft, which was reported in newspapers and caused Plaintiff to lose his job); *Parkin v. Cornell Univ., Inc.*, 182 A.D.2d 850, 852 (3d Dep't 1992)(Award of $10,000 for defendant falsely accusing plaintiff of theft, which was reported in the media); *Rossignol v. Silvernail*, 185 A.D.2d 497 (3d Dep't 1992)(Reducing compensatory damages from $800,000 to $85,000 for a plaintiff who was falsely accused of sexually abusing a child); *Nellis v. Miller*, 101 A.D.2d 1002, 1002 (4th Dep't 1984)(finding that a compensatory damages award of $150,000 [and reducing it to $5,000] was "shockingly excessive" for a defamatory news release stating that plaintiff was terminated as undersheriff for "unprofessional conduct causing internal strife within the Department").

Furthermore, a Court should grant remittitur when the jury award is based upon speculation. *See Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015)("[O]ur detailed assessment of the trial evidence bearing on damages convinces us that the jury's inclusion in its award of $900,000 for the lost developer's fee was impermissibly speculative."); *Stampf v. Long Island R. Co.*, 761 F.3d 192, 208 (2d Cir. 2014)(Reducing $100,000 of compensatory damages to $20,000 because the $100,000 award was based upon speculation); *Alla v. Verkay*, 979 F. Supp. 2d 349, 376 (E.D.N.Y. 2013)(granting remittitur because the "damages award [was] rooted in speculation"); *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 577 (S.D.N.Y. 2011)(granting remittitur because

the compensatory damages award was "unduly speculative and would arguably constitute a 'windfall'").

Remittitur is also appropriate when the jury award provides a plaintiff with a double recovery. *See Bender v. City of New York*, 78 F.3d 787, 795 (2d Cir. 1996)("[W]e deem the excessiveness of the aggregate award to be plain error, especially since it so likely results from impermissible duplication. *** [T]o remedy that excessiveness, at least down to the level of the amount unchallenged by appellants, we will reverse the judgment and order a new trial unless Bender agrees to remit $150,000. If the remittitur is not made, we leave to the District Court, on remand, the determination of whether the new trial should be limited to a retrial of the damages issues."); *Phelan v. Loc. 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada*, 973 F.2d 1050, 1063–64 (2d Cir. 1992)("A plaintiff may not recover twice for the same injury. *** [Plaintiff] has [not] directed us to any evidence that he did not fully recover in the NLRB proceeding for back pay damages between February 27, 1985 and June 3, 1985, the date on which the jury concluded damages ceased. Accordingly, the back pay award against Patrick Quinn should be set off in full to prevent a double recovery.").

Here, the general compensatory damages for the defamation claim should be no more than $100,000, and no more than $368,000 (the low estimate provided by Professor Humphreys) for the reputation repair campaign. This is so for multiple reasons as detailed above in the Statement of Facts, which establish that the jury awards in this case for these categories of damages were speculative and based upon alleged harms caused by the June 2019 Statements.

**First**, the overall essence of Plaintiff's defamation claim was that Defendant allegedly defamed Plaintiff when he denied her rape allegation. *See* Complaint (Exhibit A) at ¶¶ 96 & 98. As noted above, the Jury found that Defendant did not rape Plaintiff, and thus, the portions of the defamation claim based upon an alleged rape failed. Accordingly, all that was left of Plaintiff's defamation claim was

that Defendant defamed Plaintiff by stating that "he had no idea who Carroll was" (Complaint [Exhibit A] at ¶ 97), which is far less damaging to Plaintiff's reputation than accusing Plaintiff of lying about the alleged rape.

**Second**, Plaintiff testified that Defendant libeled her when he denied the Bergdorf Goodman Incident in his June 2019 Statements, and damages for such alleged defamation cannot be part of the jury award because they are the subject of *Carroll I*. *See Carrol I* Complaint (Exhibit C); Tr. at pp. 262-270. Specifically, Plaintiff testified that she suffered significant harm from the June 2019 Statements, including substantial damage to her reputation, losing her position at *Elle* magazine, and receiving death threats (causing her to purchase bullets for her gun for protection). (Tr. 268:20 - 269:19; 271:10 - 273:10). Importantly, Carroll did not even attempt to separate the harm caused by the June 2019 Statements and the October 12, 2022 Statement. While the Jury was not permitted to award compensatory damages for the June 2019 Statements, it clearly must have done so, which makes its award speculative and duplicative of any compensatory damages awarded in *Carroll I*.

**Third**, Professor Humphreys testified about the purported harm arising from the June 2019 Statements and even compared Plaintiff's reputation before the June 2019 Statements and after the October 12, 2022 Statement, but did not do a comparison between her reputational harm before and after the October 12, 2022 Statement. (Tr. 1129:15 - 1130:12; 1135:2-8). Therefore, Professor Humphreys must have included the alleged harm from the June 2019 Statements as part of her damages analysis.

**Fourth**, during summation, Plaintiff argued that the Jury should look at Professor Humphreys's testimony for determining an amount to award for reputation harm for Defendant's "public statements" in general, which must include the June 2019 Statements for the reasons set forth above. (Tr. 1272:8-17).

**Fifth**, Professor Humphreys testified that she could not narrow her estimate as to how many times the October 12, 2022 Statement was viewed on Truth Social and Twitter to anything more specific than somewhere "between 1.5 million and 5.7 million times," which is an error rate of 74%. (Tr. 1125:17 - 1126:8). Such an analysis is thus pure speculation.

**Sixth**, Professor Humphreys testified that the people who read and believed the October 12, 2022 Statement were "republicans [who] typically believe Mr. Trump." (Tr. 1133:18 - 1134:4). Plaintiff's reputation with such persons (people who typically believe Defendant) likely would not have been positive regardless of the October 12, 2022 Statement, because Defendant already denied Plaintiff's accusations in the June 2019 Statements and Plaintiff was attacking a political figure that such persons heavily supported. Consequently, Professor Humphreys did not take into consideration the fact that Trump's supporters likely would never have supported or believed Plaintiff regardless of the October 12, 2022 Statement, and that Plaintiff's reputation with such supporters would not have changed due to such statement.

**Seventh**, Professor Humphreys testified that in order to repair Plaintiff's reputation with such Trump supporters, Plaintiff would have to pay for the cost of a reputation repair campaign, which is "a campaign to put out positive messages about" Plaintiff. (Tr. 1136:1-13; 1136:25 - 1137:6). However, Professor Humphreys did not explain how existing Trump supporters would have changed their minds about Plaintiff from merely seeing positive messages about Plaintiff. Professor Humphreys also testified that she has never done a reputation repair campaign before, and thus, her opinion on this issue should be given little weight. (Tr. 1136:14-16).

**Eighth**, Professor Humphreys testified that (a) the June 2019 Statements already existed as of the October 12, 2022 Statement, and that readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement (Tr. 1149:2

20

- 1150:3); and (b) she does not know if the people who believed the October 12, 2022 Statement had already made up their minds about Plaintiff's rape allegation from reading the June 2019 Statements. (Tr. 1150:4-19).

Therefore, Professor Humphreys's testimony about changing the minds of Trump supporters (the target of the reputation repair campaign) is pure speculation. Additionally, her testimony only supports the argument that the October 2022 Statement did not cause Plaintiff any harm in addition to any harm that was caused by the June 2019 Statements, because people already had made up their minds as to the veracity of Plaintiff's accusations as of the June 2019 Statements.

**Ninth**, Professor Humphreys's cost estimate for such a campaign was equally based upon pure conjecture in that she estimated that it would cost anywhere from $368,000 to $2.7 million (Tr. 1139:20 - 1141:21), which is an error rate of 86 percent. This is especially troublesome since Professor Humphreys testified that she has never done a reputation repair campaign before. (Tr. 1136:14-16).

**Tenth**, Professor Humphreys also testified that she did not analyze any of Plaintiff's numerous media appearances where Plaintiff enhanced her reputation with regard to her allegations against Defendant. (Tr. 1148:8 -19; 1152:13- 1153:11). In fact, Plaintiff conceded that she received a vast amount of positive support from the public after making her accusation against Defendant. (Tr. 270:4-14; 552:15 - 553:2; 568:21-25). Even though Professor Humphreys admitted that Plaintiff received positive support from the public after the rape allegation, she did not factor such support into her analysis of the harm allegedly caused by the October 12, 2022 Statement. (Tr. 1154:3-13). Accordingly, her analysis of reputational harm is pure speculation. (*Id.*).

**Eleventh**, Plaintiff also testified that she has made more money after leaving Elle magazine because of her successful business with Substack. (Tr. 272:21 - 273:5; *see also* 317:12-21; 547:15-19;

550:2-5). Therefore, Plaintiff clearly has suffered no financial harm from the October 12, 2022 Statement, and Professor Humphreys did not factor that into her analysis.

Therefore, the Jury's $2.7 million award for Plaintiff's defamation claim was clearly motivated by sympathy rather than by evidence of harm, and the Court should grant a new trial as to compensatory damages for the defamation claim, or grant a remittitur of such award to an amount no more than $100,000 for general compensatory damages and $368,000 for the reputation repair campaign (the low end estimate for such a campaign according to Professor Humphreys).

**C.**      **Punitive Damages for the Defamation Claim**

Under New York law, punitive damages must be reviewed by a court under the due process standards set forth in the United States Supreme Court case *BMW of North America v. Gore*, 517 U.S. 559 (1996). *See, e.g., Heller v. Louis Provenzano, Inc.*, 303 A.D.2d 20, 23 (1ˢᵗ Dep't 2003).

The *Gore* due process standards are as follows:

> The Supreme Court outlined three "guideposts" to facilitate its review of state court punitive damage awards: (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the actual harm inflicted, and (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

*Stampf v. Long Island R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014).

"The third guidepost—'the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases'—is not instructive ... for defamation, a common law tort." *Jester v. Hutt*, 937 F.3d 233, 241 n. 1 (3d Cir. 2019).

Furthermore, a ratio of 1:1 or less is appropriate here because there is a very low degree of reprehensibility, if any. *See Stampf*, 761 F.3d at 211 ("In any event, the ratio of the jury's award of punitive damages to the compensatory award (as reduced) is 1:1, which does not 'raise a suspicious

judicial eyebrow.'")(quoting *Gore*, 517 U.S. at 582).

This is so because Defendant's conduct with regard to the October 12, 2022 Statement is barely reprehensible, if at all, because he was defending himself against a false accusation of rape. Again, the Jury found that Defendant did not rape Plaintiff, and Plaintiff has always portrayed the Bergdorf Goodman Incident as nothing less than a rape.

Therefore, Defendant's conduct is clearly no worse than other defendants against whom punitive damages awards have been rendered in the amount of $50,000 or less. *See Lindsey v. Butler*, No. 11-CV-9102 (ER), 2022 WL 17849009 (S.D.N.Y. Dec. 22, 2022)(punitive damages award of $50,000 for an officer forcibly shaving plaintiff-arrestee's face which violated plaintiff's religious beliefs); *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, No. 14-CV-3673 (KAM)(JO), 2020 WL 1083771, at \*24 (E.D.N.Y. Mar. 6, 2020)(awarding plaintiff-employee $10,000 each in punitive damages against defendant-employer for defendant subjecting plaintiff's to involuntary religious practices); *Nelson v. Cnty. of Suffolk*, No. 12CV5678DRHAKT, 2019 WL 3976526, at \*18 (E.D.N.Y. Aug. 22, 2019)(awarding punitive damages totaling $21,000.00 against two detectives for allowing the prosecution of plaintiff to continue even though they knew that charges were false as early as the date of plaintiff's arraignment); *Small v. New York State Dep't of Corr. & Cmty. Supervision*, No. 12-CV-1236S, 2019 WL 1593923, at \*14 (W.D.N.Y. Apr. 15, 2019)(awarding $50,000 in punitive damages for defendant's sexual harassment of plaintiff, including "unrebutted evidence of his harassing behavior, including leaving notes on Small's car, accusing Small of being with other men, filing false charges against her at work, and acting in a manner to cause the need for Small to obtain a protective order against him, all during the period when he claims to have minimized his contact with her"); *Fisher v. Mermaid Manor Home for Adults, LLC*, No. 14-CV-3461 (WFK)(JO), 2016 WL 7330554, at \*1 (E.D.N.Y. Dec. 16, 2016)(award of $50,000 in punitive damages for defendant-employer using "an

Instagram photo comparing Plaintiff[-employee], an African American Home Health Aid, to a fictional chimpanzee from the movie Planet of the Apes," otherwise creating a racially hostile work environment for plaintiff and retaliating against plaintiff after plaintiff complained); *Milfort v. Prevete*, 3 F. Supp. 3d 14, 26 (E.D.N.Y. 2014)(awarding $5,000 of punitive damages against police officer who "unjustly targeted and falsely arrested" plaintiff); *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 580 (S.D.N.Y. 2011)(awarding $50,000 in punitive damages for defendant's retaliatory conduct which violated federal and state discrimination statutes and "was certainly reprehensible"); *Norris v. New York City Coll. of Tech.*, No. 07-CV-853, 2009 WL 82556, at *7 (E.D.N.Y. Jan. 14, 2009)(award of $25,000 in punitive damages where defendant "acted intentionally and with knowledge that his conduct would violate [plaintiff's] rights").

Consequently, the Jury's $280,000 punitive damages award for Plaintiff's defamation claim clearly violated due process under *Gore*, and the Court should grant a new trial as to such punitive damages, or grant a remittitur of such award to an amount no more than $50,000.

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant his Motion for

a new trial or remittitur pursuant to Fed. R. Civ. P. 59 to the amounts set forth above, with such further

and other relief as the Court deems just and equitable.

Dated: New York, New York
      June 8, 2023

                        TACOPINA, SEIGEL & DeOREO

                        By: _____
                            Joseph Tacopina, Esq.
                            Chad Seigel, Esq.
                            Matthew G. DeOreo, Esq.
                            275 Madison Ave., Fl. 35
                            New York, New York 10016
                            Tel: (212) 227-8877
                            Fax: (212) 619-1028
                            jtacopina@tacopinalaw.com
                            cseigel@tacopinalaw.com
                            mdeoreo@tacopinalaw.com
                            *Counsel for Defendant Donald J. Trump*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

        *Plaintiff*,

    v.

DONALD J. TRUMP,

        *Defendant*.

No. 22 Civ. 10016 (LAK)

---

## PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION FOR A NEW TRIAL OR REMITTITUR

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carrol*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ......................................................................................................... 2

ARGUMENT ............................................................................................................ 10

    I.   THE JURY'S COMPENSATORY DAMAGES AWARD FOR BATTERY IS NOT
        EXCESSIVE ............................................................................................... 11

    II.  THE DEFAMATION DAMAGES ARE NOT EXCESSIVE EITHER .......................... 17

        A.  The Compensatory Damages Accurately Reflect the Evidence Presented at Trial .... 17

        B.  The Punitive Damages for Defamation Are Proportional and Reasonable ............... 25

CONCLUSION .......................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*A.B. v. Staropoli*,
  No. 08 Civ. 4585, 2013 WL 12441525 (S.D.N.Y. Dec. 11, 2013)...........................................16

*Alcantara v. Bell*,
  No. 19 Civ. 3686, 2022 WL 4638127 (E.D.N.Y. Sept. 30, 2022)..........................................13

*Allen v. CH Energy Grp., Inc.*,
  58 A.D.3d 1102 (3d Dep't 2009)...........................................................................................24

*Anderson v. Eli Lilly & Co.*,
  79 N.Y.2d 797 (1991)............................................................................................................12

*Bender v. City of N.Y.*,
  78 F.3d 787 (2d Cir. 1996)....................................................................................................20

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559, 116 S. Ct. 1589 (1996)..............................................................................25, 26

*Boule v. Hutton*,
  328 F.3d 84 (2d Cir. 2003)....................................................................................................17

*Bouveng v. NYG Cap. LLC*,
  175 F. Supp. 3d 280 (S.D.N.Y. 2016)...............................................................................18, 26

*Breest v. Haggis*,
  No. 161137/2017, 2023 WL 374404 (N.Y. Sup. Ct., N.Y. Cty. Jan. 24, 2023)................14, 17

*Cantu v. Flanigan*,
  705 F. Supp. 2d 220 (E.D.N.Y. 2010)..................................................................................25

*Carroll v. Trump*,
  No. 22 Civ. 10016, 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023)...........................................16

*Dalbec v. Gentleman's Companion, Inc.*,
  828 F.2d 921 (2d Cir. 1987)..................................................................................................24

*Doe v. Green*,
  No. 17 Civ. 1765, 2021 WL 2188534 (S.D.N.Y. Apr. 29, 2021)...........................................15

*Doe v. Green*,
  No. 17 Civ. 1765, 2021 WL 2188148 (S.D.N.Y. May 28, 2021)...........................................15

*Egan v. Gordon*,
  No. 904231-20 (N.Y. Sup. Ct., Albany Cty., Nov. 10, 2022) .................................................. 15

*Ferri v. Berkowitz*,
  561 F. App'x 64 (2d Cir. 2014) ...................................................................................... 17, 18

*Fin. Cas. & Sur. Co., Inc. v. Zouvelos*,
  No. 12 Civ. 3476, 2018 WL 3950634 (E.D.N.Y. May 3, 2018) ........................................... 18

*France & Canada S.S. Corp. v. Berwind-White Coal Mining Co.*,
  229 N.Y. 89 (1920) ........................................................................................................... 10

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) ................................................................................. 20

*In re Vivendi Universal, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ............................................................................................... 20

*ING Glob. v. United Parcel Serv. Oasis Supply Corp.*,
  757 F.3d 92 (2d Cir. 2014) ........................................................................................... 10, 22

*Jacques v. DiMarzio, Inc.*,
  386 F.3d 192 (2d Cir. 2004) ............................................................................................... 22

*Jalal v. Shanahan*,
  No. 16 Civ. 281, 2018 WL 10466837 (E.D.N.Y. May 10, 2018) ......................................... 24

*Jennings v. Yurkiw*,
  18 F.4th 383 (2d Cir. 2021) ............................................................................................... 25

*Jester v. Hutt*,
  937 F.3d 233 (3d Cir. 2019) ............................................................................................... 25

*Johnson v. White*,
  No. 06 Civ. 2540, 2010 WL 11586681 (S.D.N.Y. Nov. 18, 2010) ....................................... 15

*King v. Macri*,
  800 F. Supp. 1157 (S.D.N.Y. 1992) ................................................................................... 17

*Laurie Marie M. v. Jeffrey T.M.*,
  159 A.D.2d 52 (2d Dep't 1990) ......................................................................................... 16

*Laurie Marie M. v. Jeffrey T.M.*,
  77 N.Y.2d 981 (1991) ....................................................................................................... 16

*Leather v. Ten Eyck*,
  97 F. Supp. 2d 482 (S.D.N.Y. 2000) ................................................................................... 17

*Leather v. Ten Eyck*,
    2 F. App'x 145 (2d Cir. 2001) ............................................................... 17

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003) ............................................................. 19

*Lippe v. Bairnco Corp.*,
    99 F. App'x 274 (2d Cir. 2004) ............................................................ 19

*Lore v. City of Syracuse*,
    670 F.3d 127 (2d Cir. 2012) ................................................................. 10

*Lynch v. N.Y. Times Co.*,
    171 A.D. 399 (1st Dep't 1916) ............................................................ 17

*Mathie v. Fries*,
    121 F.3d 808 (2d Cir. 1997) ................................................................. 15

*Matter of Ariana F.F.*,
    202 A.D.3d 1440 (4th Dep't 2022) ...................................................... 14

*Miller v. State*,
    110 A.D.2d 627 (2d Dep't 1985) .......................................................... 16

*MJAC Consulting, Inc. v. Barrett*,
    No. 04 Civ. 6078, 2006 WL 2051129 (S.D.N.Y. July 24, 2006) ........... 19

*Offei v. Omar*,
    No. 11 Civ. 4283, 2012 WL 2086356 (S.D.N.Y. June 8, 2012)............. 15

*Ortiz v. N.Y. City Hous. Auth.*,
    22 F. Supp. 2d 15 (E.D.N.Y. 1998) ..................................................... 15

*Ortiz v. N.Y. City Hous. Auth.*,
    198 F.3d 234 (2d Cir. 1999) ................................................................. 15

*Osorio v. Source Enters., Inc.*,
    No. 05 Civ. 10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) ....... 18, 24

*Perney v. Medical One New York, P.C.*,
    No. 159080/2019, 2020 WL 8613521 (N.Y. Sup. Ct., N.Y. Cty. Feb. 17, 2020) ................... 15

*Phelan v. Loc. 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada*,
    973 F.2d 1050 (2d Cir. 1992) ............................................................... 21

*Powers v. Memorial Sloan Kettering Cancer Ctr.*,
    No. 20 Civ. 2625, 2022 WL 874846 (S.D.N.Y. Mar. 24, 2022) ........... 12

*Purgess v. Sharrock*,
   33 F.3d 134 (2d Cir. 1994) ........................................................................ 24, 26

*Ravina v. Columbia Univ.*,
   No. 16 Civ. 2137, 2019 WL 1450449 (S.D.N.Y. Mar. 31, 2019) ............................ 26

*Restivo v. Hessemann*,
   846 F.3d 547 (2d Cir. 2017) .......................................................... 10, 11, 12, 14

*Rombom v. Weberman*,
   No. 1378/00, 2002 WL 1461890 (N.Y. Sup. Ct., Kings Cty. June 13, 2002) .......... 26

*Rombom v. Weberman*,
   766 N.Y.S.2d 88 (2d Dep't 2003) ............................................................... 26

*Stampf v. Long Island R. Co.*,
   761 F.3d 192 (2d Cir. 2014) ...................................................................... 10

*Strader v. Ashley*,
   61 A.D.3d 1244 (3d Dep't 2009) ................................................................ 24

*Torres v. Hyun Taik Cho*,
   902 N.Y.S.2d 781 (Sup. Ct., N.Y. Cty. 2010) ............................................... 12

*Turley v. ISG Lackawanna, Inc.*,
   774 F.3d 140 (2d Cir. 2014) ...................................................................... 25

*United States v. Gleason*,
   616 F.2d 2 (2d Cir. 1979) ......................................................................... 16

*United States v. Williams*,
   690 F.3d 70 (2d Cir. 2012) ....................................................................... 21

*Vargas v. Premiere Staff Agency*,
   No. 17 Civ. 4280, 2019 WL 10632865 (S.D.N.Y. July 18, 2019) ...................... 16

*Vargas v. Premiere Staff Agency*,
   No. 17 Civ. 4280, 2020 WL 5663412 (S.D.N.Y. Sept. 23, 2020) ...................... 16

*Webber v. Dash*,
   607 F. Supp. 3d 407 (S.D.N.Y. 2022) ...................................................... 25, 26

*Witherspoon v. State of Ill.*,
   391 U.S. 510, 88 S. Ct. 1770 (1968) .......................................................... 17

*Xiaokang Xu v. Xiaoling Shirley He*,
   147 A.D.3d 1223 (3d Dep't 2017) ............................................................. 24

*Yammine v. DeVita*,
   43 A.D.3d 520 (3d Dep't 2007) ................................................................... 17

**Statutes**

10 U.S.C. § 920 .......................................................................................... 13

N.Y. C.P.L.R. § 5501 .................................................................................. 10

**Rules**

Federal Rule of Civil Procedure 59 ........................................... 8, 10, 18, 22

Federal Rule of Evidence 702 .................................................................... 19

**Other Authorities**

N.Y. Pattern Jury Instr., Civil 3:29 ........................................................... 17

Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2810.1 (3d ed.) ................. 19

## PRELIMINARY STATEMENT

Over the course of two and a half days of trial testimony, E. Jean Carroll spoke clearly, powerfully, and courageously about the harms caused by Donald J. Trump when he sexually assaulted her more than 25 years ago in a dressing room at Bergdorf Goodman and then lied about her publicly in October 2022. Two experts—one on psychological harms and the other on defamation damages—backed her testimony with credible and reliable analysis. The jury considered that evidence carefully. And ultimately, the jury concluded that Carroll was telling the truth and Trump was not, finding that Trump had sexually abused and later defamed Carroll and awarding her $5 million in damages.

Importantly, on this motion, Trump does not seek to disturb the jury's verdict on the merits. Rather, he takes issue with the amount of money that the jury awarded Carroll as damages. But Trump's motion is nothing more than his latest effort to obfuscate the import of the jury's verdict by engaging in his own particular Trump-branded form of magical thinking. Once again, Trump has the nerve to claim public vindication from the jury in this case when, in fact, the jury determined that he penetrated Carroll's vagina with his fingers without her consent and then defamed her last year. *See also Carroll v. Trump*, No. 20 Civ. 7311 (S.D.N.Y.) ("*Carroll I*"), ECF 168 at 3–7. His factual misrepresentations about what happened at trial are only compounded by the legal errors in his brief, both in articulating how courts have applied the relevant standards to assess battery and defamation jury awards and in suggesting how those standards should apply to the damages awarded here. As explained further below, the Court should reject Trump's request either for a new trial on damages, or for the Court to decrease on its own the amount that the jury determined that Trump now owes.

# BACKGROUND

During a two-week trial, the jury in this case heard credible testimony from nine fact witnesses and two expert witnesses, all of whom Carroll called during her case-in-chief to support her sexual battery and defamation claims. Seventy-eight total documents and videos were admitted into evidence as exhibits. Trump, for his part, did not call a single witness and did not take the stand himself, opting instead for the jury to hear from him solely through his prior videotaped deposition testimony. Taken together, this presentation of evidence overwhelmingly supported the jury's finding for Carroll on the merits, as well as its award of $2 million and $2.7 million in compensatory damages for battery and defamation, respectively, and its relatively modest award of $300,000 in punitive damages (mostly on the defamation claim).

***The underlying sexual assault.*** Carroll testified that one evening during the spring of 1996, she ran into Trump at the 58th Street entrance of Bergdorf Goodman. Ex. 1 ("Tr.") at 170:10–13, 356:21–24.[1] Trump recognized Carroll and asked her to help him pick out a gift for a woman. Carroll obliged. *Id.* at 171:2–16. Trump eventually suggested that they go to the lingerie department on the sixth floor. *Id.* at 172:19–173:6. Once there, the two came across a piece of lingerie set on top of a glass display case. *Id.* at 174:19–21. After some playful banter about who should try on the bodysuit, Trump took Carroll's arm and led her toward the dressing room. *Id.* at 175:18–20, 176:1–22.

As soon as Carroll entered the room, Trump "immediately shut the door and shoved [her] up against the wall," banging her head. *Id.* at 177:22–23. Carroll pushed Trump back, trying to break the tension, but he "thrust [her] back against the wall again, banging [her] head" once more. *Id.* at 178:11–12. Then, Trump pinned Carroll against the wall with his shoulder—"his whole

---

[1] All "Ex." cites are to exhibits attached to the accompanying declaration of Roberta A. Kaplan.

weight came against [her] chest and held [her] up there." *Id.* at 178:23–179:2. "[H]e leaned down and pulled down [her] tights." *Id.* at 179:2–3. She could hear him breathing in her ear. *Id.* at 179:17. He pushed his mouth against hers. *Id.* at 179:17–18 All the while, Carroll was fighting—her "whole reason for being alive in that moment was to get out of that room." *Id.* at 180:19–20.

But she couldn't overpower Trump. "[H]e had pulled down [her] tights and … his fingers went into [her] vagina." *Id.* at 180:22–24. Carroll testified that "it was a horrible feeling because … he put his hand inside of [her] and curved his finger," which "was extremely painful, extremely painful." *Id.* at 180:24–181:1. Carroll told the jury that sitting on the witness stand—more than 25 years later—she could "still feel" the pain and sensation of Trump forcibly penetrating her with his fingers. *Id.* at 181:1–2. Carroll believed that Trump then inserted his penis into her vagina. But he was leaning against her with his whole weight, and while she couldn't see precisely what was happening, she "could certainly feel that pain in the finger jamming up." *Id.* at 181:20–23. Finally, Carroll managed to get her knee up and push Trump off her. *Id.* at 182:14–16. She rushed out of the dressing room and left the store as quickly as she could. *Id.* at 182:18–19. Carroll returned to her car and drove home, her head and vagina still hurting. *Id.* at 187:14–18. That night (like many nights that followed) Carroll relived the attack over and over again in her mind, visions of the attack "wash[ing] over [her]." *Id.* at 225:19.

***Harms resulting from the assault.*** Trump's traumatic attack would negatively affect Carroll for the rest of her life. At first, Carroll's "overwhelming thought was [that she] had died and was somehow still alive." *Id.* at 635:23–636:1. Dr. Leslie Lebowitz, a psychological expert and trauma specialist, testified that this is a common experience for survivors of violent sexual attacks: this kind of attack "so violates [a victim's] sense of humanity and independence and selfhood tha[t] people feel psychologically that they are being killed. They feel at risk. They feel

3

like their personhood is being murdered, even if they know at some level that they were never in that kind of mortal, physical danger." *Id.* at 865:8–13.

In a very real sense, Trump did kill an integral part of Carroll's dignity and identity in the Bergdorf's dressing room that evening—Carroll would not go on to have a romantic relationship or sexual relationship ever again. *Id.* at 215:23–25, 216:18–20. Carroll had actively dated before the attack. *Id.* at 217:19–20. Indeed, she "loved meeting men … loved going out … loved conversations." *Id.* at 217:19–20. But afterward, whenever Carroll met a potential romantic partner, it was "impossible" for her "to even look at him and smile." *Id.* at 216:9–12. That inability to engage in this way was a direct result of Trump's violent attack: "What I did was I flirted with Donald Trump. I laughed with him. I tried to be—tried to engage him. I laughed at his jokes. I found him charming. And what happened to me when I was flirting? I got into serious trouble." *Id.* at 216:6–9; *see also id.* at 220:16–23, 216:3–17. This pattern of avoidance, as Dr. Lebowitz testified, "led to an inability [for Carroll] to maintain a romantic and intimate life, which has led to deep feelings of loss." *Id.* at 875:18–20. Dr. Lebowitz further emphasized that Carroll's aversion to romantic relationships was "a complete departure" from Carroll's "previous pattern" of long-term relationships. *Id.* at 883:10–19. Carroll consciously felt this loss, too: "I feel I have lost out. … I am a happy person basically, but I'm aware that I have lost out on one of the glorious experiences of any human being." *Id.* at 221:7–9; *see also id.* at 221:9–14.

In addition to losing out on one of life's great joys, Carroll has also suffered from intense intrusive memories or "intrusions" that have affected nearly all aspects of her life. These intrusions take the form of various memories of what happened at Bergdorf's that suddenly and randomly "take over [her] brain." *Id.* at 226:3–7. Carroll told the jury about one recent example. Late one evening, decades after the attack, she pulled off the road on her way home because she was feeling

tired and wanted to take a quick nap. *Id.* at 226:11–13. She closed her eyes and the next thing she knew she "felt Donald Trump again on top of [her]." *Id.* at 226:13–15. She couldn't breathe; she "thought for a minute [that she] was going to die." *Id.* at 226:15–16.

These intrusive memories are often combined with physical symptoms. Carroll has sometimes felt "[Trump's] fingers jammed up inside of [her]," as if the assault were happening again. *Id.* at 226:18–21. And those physical symptoms have often occurred when Carroll has had to speak about the assault. During Carroll's evaluation with Dr. Lebowitz as part of this case, Carroll had to recount the sexual assault and her subsequent experiences with intrusions in painstaking detail. At the end of the evaluation, as Dr. Lebowitz herself observed, Carroll was "doubled over, holding her stomach and just said I have a really bad stomachache." *Id.* at 867:1–2. In the days that followed, Carroll "got actually very sick with pneumonia." *Id.* at 867:2–6. Then, Carroll's stomach issues returned when she and Dr. Lebowitz continued their evaluation weeks later. Dr. Lebowitz testified that, in her professional opinion, these physical symptoms were either the result of or exacerbated by Carroll having to review the entire assault in detail. *Id.* at 866:23–867:1.

The sexual assault has deeply affected how Carroll thinks of herself, causing her to experience self-blame and shame. *Id.* at 187:1–6. Dr. Lebowitz explained how Carroll continues to hold herself responsible for the assault, even though she consciously knows that it was not her fault. All of Carroll's attempts to avoid victimhood were because Trump's assault "made her feel like she was worth less than she had been before. She felt degraded and diminished. She felt like she had been treated as if she wasn't even a person." *Id.* at 876:2–5; *see also id.* at 875:21–876:7, 876:25–877:17. In part to ease the blame that she felt, Carroll testified that she has long resisted

using the word "rape" to describe the assault. *Id.* at 545:13–17. Instead, she "liked the word 'fight'" because it "gave [her] action" and made her feel less like a victim. *Id.* at 545:17–18, 876:8–24.

Carroll's injuries continue to this day. Dr. Lebowitz concluded that Carroll has exhibited severe symptoms in at least three of the four diagnostic categories for post-traumatic stress disorder. *Id.* at 853:11–15. She also testified that, based on the academic literature and her professional experience seeing patients, having a few severe symptoms of post-traumatic stress may be as bad as being diagnosed with PTSD as the result of meeting all four diagnostic criteria for the disorder. *Id.* at 854:1–7.

***The defamation and resulting harms.*** Carroll's psychological harms contributed to her decision to remain silent about Trump's attack for decades. It wasn't until 2019 that she told her story publicly for the first time. In June of that year, Carroll published an excerpt from her forthcoming book that included a description of her encounter with Trump in *New York Magazine*. *Id.* at 250:9–20. Over the next several days, Trump responded to Carroll's allegations with a series of defamatory statements denying Carroll's allegations and attacking her motives for coming forward. *See* Exs. 2, 3, 4. Those statements, and their resulting harms, are at issue in the related action, *Carroll I.* However, Carroll testified about these statements—and Trump's counsel did not object to their admission—because they provided essential context to the present dispute concerning a more recent defamatory statement that Trump made.

On October 12, 2022, Trump posted about Carroll on the social media platform Truth Social. In his statement, Trump falsely wrote that Carroll's accusation was "a complete con job" and a "hoax and a lie"; "this so–called 'event' … never happened"; Carroll was making up "a complete scam" to "promot[e] a really crummy book"; and Carroll was "not [his] type!" Ex. 5. The statement continued: "E. Jean Carroll is not telling the truth, is a woman I had nothing to do

with, didn't know, and would have no interest in knowing her if I ever had the chance." *Id.* Trump admitted that he wrote the statement himself and subsequently had it disseminated to major press outlets. Ex. 6 at 127:5–20 (transcript of Trump deposition designations).

Trump's statement reached a broad audience. At the time he published it, Trump had roughly 4.7 million followers on Truth Social, and the statement was covered widely in the press. Tr. 1116:9–12. Professor Ashlee Humphreys—Carroll's defamation damages expert—testified that based on conservative estimates, Trump's October 2022 defamatory statement garnered between 13.7 million and 18 million impressions across various media. *Id.* at 1127:19–25. According to her expert opinion, between 3.7 million and 5.6 million of those impressions were "receptive impressions," meaning they involved individuals likely to believe Trump's statement. *Id.* at 1134:12–19. Professor Humphreys thus determined that it would cost up to $2.7 million to run an adequate reputation repair campaign to counteract the *negative* impressions caused by Trump's defamatory statement. *Id.* at 1141:14–21.

Carroll testified as to additional harms that Trump's October 2022 statement caused. At the time Trump issued the statement, Carroll had just "managed to get [her] Substack up and running, get [her] career a little bit back and feeling that things were going to be OK." *Id.* at 320:14–16. She testified that she had "really thought [she] was gaining back a bit of ground." *Id.* at 322:8. She felt "happy" to be "back on [her] feet," but "then, boom, he knock[ed] [her] back down again." *Id.* at 322:10–12. And, in the wake of this statement, Carroll was buried by "a wave of slime." *Id.* at 323:20–23. Trump's supporters inundated Carroll with "very seedy," "very denigrating" comments, repeating, for instance, Trump's refrain that she was too ugly to assault. *Id.* at 323:23–324:2. Carroll testified that these messages were uniquely painful: "It is very hard to get up in the morning and face the fact that you're receiving these messages [that] you are just too

ugly to go on living, practically." *Id.* at 324:2–5. Professor Humphreys confirmed that "a huge volume, a very large number, tens of thousands of online … associations [with Carroll] were really negative." *Id.* at 1135:7–8.

**Jury verdict.** At the end of the two-week trial, the Court charged the jury. On the battery count, the Court explained that "Carroll claims that Trump is liable to her for battery on three different and alternative bases, each of which corresponds to a criminal law definition of a different sex crime. Trump denies that he is liable to her for battery on any of these three different and alternative bases." *Id.* at 1416:1–5.[2] The jury ultimately concluded that Trump had sexually abused Carroll. ECF 174. Consistent with the Court's instruction, this result means that the jury found that Trump used physical force to engage in sexual contact against Carroll without her consent in order to gratify his own sexual desires. Tr. 1418:3–1419:20.

Regarding battery damages, the Court instructed that if the jury decided that Trump committed battery, it would be their "task to determine from the evidence a dollar amount, if any, that would justly and adequately compensate Carroll for any physical injury, pain and suffering, and mental anguish, as well as emotional distress, fear, personal humiliation, and indignation that she has suffered, or will suffer in the future, as a result of Trump's … sexual abuse." Tr. 1422:24–1423:5. The Court specifically noted that the "[d]amages may be awarded based on a plaintiff's subjective testimony of pain." *Id.* at 1423:23–24. The jury awarded Carroll $2 million in damages for harms resulting from the sexual abuse. ECF 174. Additionally, the Court charged that the jury "may award punitive damages if Carroll proved by a preponderance of the evidence that Trump's

---

[2] Although Trump is preoccupied by Carroll's complaint in this action—and specifically her allegations concerning rape—it is unclear how they are relevant to his Federal Rule of Civil Procedure 59(a) motion, given that there is now a complete trial record to draw from. In any event, and contrary to Trump's implication that Carroll only pleaded rape in her complaint, Carroll alleged that "Trump's actions constitute sexual offenses as defined in Article 130 of the New York Penal Law, including but not limited to rape in the first degree (§ 130.35), rape in the third degree (§ 130.25), sexual abuse in the first degree (§ 130.65), sexual abuse in the third degree (§ 130.55), sexual misconduct (§ 130.20), and forcible touching (§ 130.52)." ECF 1 ¶ 125.

conduct, if any, that caused Carroll's alleged injury was wanton and reckless or done with a conscious disregard for Carroll's rights." Tr. 1424:21–25. The jury found that punitive damages were appropriate and awarded Carroll an additional $20,000. ECF 174.

On the defamation count, the Court was careful to emphasize that Carroll's defamation claim was only "in relation to Trump's October 12, 2022 statement, and more specifically to the parts of that statement about Carroll." Tr. 1428:6–8. For the avoidance of doubt, the Court read all relevant excerpts of Trump's October 2022 statement during the charge. *Id.* at 1428:15–1429:10. The Court then instructed the jury on each element of defamation, and notably, as part of its instruction on the falsity element, the Court stated that "whether Trump's statement is false or true depends largely or entirely on whether you find that Trump raped *or* sexually abused *or* forcibly touched *or* otherwise sexually attacked Carroll." *Id.* at 1431:2–6 (emphases added). Consistent with the sexual abuse finding, the jury determined that Trump had defamed Carroll. ECF 174.

Regarding defamation damages, the Court instructed the jury to "award an amount that, in the exercise of your good judgment and common sense, you decide is fair and just compensation for the injury to the plaintiff's reputation and the humiliation and mental anguish in her public and private life which you decide was caused by the defendant's statement." Tr. 1433:1–5. The Court further instructed that in deciding damages resulting from the defamation, the jury "should consider the plaintiff's standing in the community, the nature of Trump's statement made about Carroll, the extent to which the statement was circulated, the tendency of the statement to injure a person such as Carroll, and all of the other facts and circumstances in the case." *Id.* at 1433:6–11. The jury awarded Carroll $2.7 million in compensatory damages, $1.7 million of which was specifically related to the cost of running an adequate reputation repair campaign. ECF 174.

Finally, the Court instructed the jury that they may award punitive damages relating to the defamation if they found that Trump's statement was made maliciously, meaning "with deliberate intent to injure or made out of hatred or ill will or spite or made with willful or wanton or reckless disregard of another's rights." Tr. 1435:6–10. The Court also provided the jury with a detailed set of considerations to guide their determination of the appropriate number of punitive damages. *Id.* at 1435:22–1436:10. The jury found that Trump's conduct warranted punitive damages for defamation in the amount of $280,000. ECF 174.

## ARGUMENT

When presented with a motion for a new trial on damages or for remittitur, "the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (citation omitted). A "high degree of deference is accorded to the jury's evaluation of witness credibility," *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014), and a jury's factual findings that bear on damages must be given "considerable deference," *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017). As the Second Circuit has long recognized, "when damages are awarded, calculation of damages is the province of the jury." *Id.*; *accord France & Canada S.S. Corp. v. Berwind-White Coal Mining Co.*, 229 N.Y. 89, 95 (1920).

As a result, a court "will not 'vacate or reduce a jury award merely because [it] would have granted a lesser amount of damages.'" *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (citation omitted). Instead, a court may order a new trial on damages or remittitur only where "the award is intrinsically excessive." *Id.* Under New York law, an award is excessive "if it deviates materially from what would be reasonable compensation." *Id.* (quoting N.Y. C.P.L.R. § 5501(c)).

"Although a review of comparable cases is appropriate," the key question is simply "whether the verdict lies within the reasonable range." *Restivo*, 846 F.3d at 587.

Trump misapplies these principles in his brief. He repeatedly advances arguments premised on mischaracterizations of the record, asking the Court to rely on a version of the facts that the jury clearly (and rightfully) rejected. And he argues for a lowest-common-denominator approach to jury verdicts, effectively claiming that damages should max out at the level of the lowest awards that Trump has been able identify across nearly four decades of reported cases. As explained below, there is no valid basis for disturbing the damages that the jury awarded to Carroll here.

## I. THE JURY'S COMPENSATORY DAMAGES AWARD FOR BATTERY IS NOT EXCESSIVE

To determine appropriate damages arising from Trump's sexual assault, the jury was instructed to identify an "amount that would fairly and adequately compensate Ms. Carroll for [her] injuries." Tr. 1424:2–3. Those injuries included "any physical injury, pain and suffering, and mental anguish, as well as emotional distress, fear, personal humiliation, and indignation that she has suffered, or will suffer in the future, as a result of Mr. Trump's … sexual abuse." *Id.* at 1423:1– 5. The Court cautioned the jury that it "may award damages only for those injuries … proved by a preponderance of the evidence," and not for any damages "based on speculation or sympathy." *Id.* at 1423:7–10. In other words, the award of damages should be "based on the evidence at trial and only that evidence," *id.* at 1423:10–11, including Carroll's "subjective testimony of pain," *id.* at 1423:24.

The extensive trial record leaves no doubt that the jury abided by these instructions. Carroll was on the witness stand for two and a half days, during which she described Trump's attack in excruciating detail and relived the painful sensation of Trump forcing his fingers inside her vagina. She testified to the damage that the attack caused her—not just in the immediate aftermath, but for

decades to follow. Carroll experienced chronic traumatic stress, feelings of shame and dirtiness, unwanted memories of the assault, a continuing inability to pursue romantic intimacy, and ultimately loss of companionship and partnership. And it was not just Carroll who gave a comprehensive account of her injuries. The jury also heard from Dr. Lebowitz, an expert in trauma, including sexual trauma, who backed up each and every aspect of Carroll's testimony and explained, in scientific terms, just how much damage Trump had caused. Trump did not present an expert of his own. Given the "considerable deference" owed to the jury's assessment of this evidence, the Court should leave the jury's $2 million verdict undisturbed. *Restivo*, 846 F.3d at 587.

Not surprisingly, each of the arguments that Trump offers for why, in his view, Carroll's damages are "grossly excessive" lacks merit. *See* ECF 184 ("Trump Br.") at 1, 13–16.

*First*, Trump mischaracterizes the nature of Carroll's damages by labeling this a "loss of consortium" case. Trump Br. 13. But under New York law, "loss of consortium is a claim specific to married persons" and represents "'the marital partners' interest in the continuance of the marital relationship as it existed at its inception.'" *Torres v. Hyun Taik Cho*, 902 N.Y.S.2d 781, 783 (Sup. Ct., N.Y. Cty. 2010) (quoting *Anderson v. Eli Lilly & Co.*, 79 N.Y.2d 797, 798 (1991)). Such a claim is derivative of the claims of the "impaired spouse" who has suffered a direct injury. *Powers v. Memorial Sloan Kettering Cancer Ctr.*, No. 20 Civ. 2625, 2022 WL 874846, at *5 (S.D.N.Y. Mar. 24, 2022). As a result, this doctrine is plainly inapplicable here. And even if considerations of companionship are relevant, a non-injured spouse's derivative claim is categorically distinct from the damages Carroll is owed for the forcible, non-consensual sexual assault that Trump committed against her. To be clear, Carroll's injuries go far beyond loss of companionship. Carroll has experienced shame and a diminished sense of self for more than 25 years, has been plagued by

intrusive memories, and has had to relive the painful sensation of Trump's fingers jamming inside her. These are not the hallmarks of a loss of consortium claim.

*Second*, Trump fares no better when trying to write this off as a mere "groping" case, in which he might have simply "grop[ed] [Carroll's] breast through clothing." Trump Br. 1, 14. In fact, that was not a version of events that was presented to the jury at trial at all. The word "breast" was not used a single time during Carroll's testimony, in contrast to the word "vagina," which was used repeatedly. The latter was a focus of Carroll's cross-examination, during which Trump's counsel pressed Carroll on the difference between "rummaging around [her] vagina" and "inserting a finger inside [it]." Tr. 406:11–12. Carroll made clear that Trump had done both, *id.* at 406:13–14, and Trump cannot now demand that damages be based on some imaginary version of events in which he did nothing more than touch Carroll's breast through her dress.

Trump's effort to draw a sharp line between forcibly penetrating Carroll with his fingers and penetrating her with his penis does not advance the ball either. There is no dispute that, in resolving Carroll's battery claim, the jury did not find that Trump had raped Carroll as that term is specifically defined under New York law. *See* Tr. 1417:2 (rape under New York law requires penetration "of the penis into the vaginal opening"). But the jury did find that he had sexually abused her. *See* ECF 174; Tr. 1418:3–1420:10. The conduct that sexual abuse covers is hardly *de minimis*. Forcibly penetrating Carroll with his fingers would make Trump liable for rape in other jurisdictions. *E.g.*, 10 U.S.C. § 920 (defining rape to include "the penetration, however slight, of the vulva … of another by any part of the body or any object"). And the jury may well have found that Trump gratified himself sexually by forcibly touching the outside of Carroll's vagina with his penis. *Alcantara v. Bell*, No. 19 Civ. 3686, 2022 WL 4638127, at *1, *6 (E.D.N.Y. Sept. 30, 2022) (defendant committed sexual abuse by "rubbing his penis on the naked buttocks" of victim);

*Matter of Ariana F.F.*, 202 A.D.3d 1440, 1442 (4th Dep't 2022) (defendant committed sexual abuse by "touch[ing] his penis to [victim's] vagina while they were both naked"). In any event, Trump's sexual abuse was still criminal under New York law, and it involved non-consensual penetration that caused Carroll significant, long-lasting harm. Put simply, Trump is not entitled to a substantial discount on damages simply because the jury found that he forcibly penetrated Carroll with his fingers instead of his penis.

*Third*, the cases that Trump cites do not justify remittitur or a new trial either. *See* Trump Br. 14–16.

It is certainly true that there are cases involving serious sexual misconduct in which a plaintiff received lower damages than Carroll did. But a verdict need only be "within [a] reasonable range," *Restivo*, 846 F.3d at 587, and the jury's middle-of-the-road award to Carroll is significantly less than the compensatory damages awarded in other cases. In *Breest v. Haggis*, for example, the jury awarded Haleigh Breest $7.5 million in compensatory damages based on her claim that she had been raped by screenwriter and director Paul Haggis in 2013. Breest experienced many of the same symptoms of sexual assault-related trauma as Carroll. After the assault, Breest, like Carroll, had difficulty going on dates and had sex only one time. Ex. 7 at 334:12–19, 364:4–8 (*Breest* trial transcript). Breest, like Carroll, repeatedly experienced unwanted memories of the assault, and those unwanted memories caused Breest emotional distress that interfered with her daily life. *Id.* at 1210:15–1211:3, 1211:21–1213:5. And Breest, like Carroll, experienced sexual violence at the hands of a powerful and influential man. While it is true that Breest, unlike Carroll, was diagnosed with PTSD and that may explain in part why the jury awarded her $5.5 million more in compensatory damages, that is no reason to find that the jury's much smaller award to Carroll was excessive. *See Breest v. Haggis*, No. 161137/2017, 2023 WL 374404, at *3 (N.Y. Sup. Ct., N.Y.

Cty. Jan. 24, 2023) (upholding damages award and citing nine cases involving even higher damages than Breest obtained); *see also Egan v. Gordon,* No. 904231-20 (N.Y. Sup. Ct., Albany Cty., Nov. 10, 2022) (jury awarded $13.8 million in compensatory damages to a rape survivor who "continuously relives" the abuse through "flashbacks," and whose personal life was shattered by the sexual violence she experienced); *Ortiz v. N.Y. City Hous. Auth.*, 22 F. Supp. 2d 15, 38–40 (E.D.N.Y. 1998) (jury awarded $3 million in compensatory damages for injuries plaintiff suffered as a result of being raped, including five-year period of anxiety and depression and loss of "interest in social activity, including sexual activity"), *aff'd*, 198 F.3d 234 (2d Cir. 1999).

The weakness of Trump's position becomes even clearer upon closer examination of several of Trump's purported "comparator" cases. *See* Trump Br. 14–16. In some cases, the plaintiff was awarded the exact amount of compensatory damages that the plaintiff herself had requested, often as part of a damages inquest conducted by a magistrate judge during default judgment proceedings. *See Doe v. Green*, No. 17 Civ. 1765, 2021 WL 2188534, at *1 (S.D.N.Y. Apr. 29, 2021), *report and recommendation adopted*, 2021 WL 2188148 (S.D.N.Y. May 28, 2021); *Johnson v. White*, No. 06 Civ. 2540, 2010 WL 11586681, at *1, *5 (S.D.N.Y. Nov. 18, 2010); *Perney v. Medical One New York, P.C.*, No. 159080/2019, 2020 WL 8613521, at *2 (N.Y. Sup. Ct., N.Y. Cty. Feb. 17, 2020); *see also Offei v. Omar*, No. 11 Civ. 4283, 2012 WL 2086356, at *1 (S.D.N.Y. June 8, 2012) (plaintiff raised no objection to damages award recommended by magistrate judge). As a result, those cases obviously have little to nothing to say about the damages that a jury might have awarded on a full evidentiary record developed at trial, as occurred here.

Other cases cited by Trump involved evidentiary issues not present in this case. *See Mathie v. Fries*, 121 F.3d 808, 815 (2d Cir. 1997) (acknowledging that "part" or "substantial part" the plaintiff's "psychological distress resulted from 'his participation in a brutal murder'" and his

15

subsequent conviction and sentence—"conditions for which [the defendant] is obviously not responsible"); *A.B. v. Staropoli*, No. 08 Civ. 4585, 2013 WL 12441525, at *7 (S.D.N.Y. Dec. 11, 2013) (noting that there was "little evidence" presented about victim's psychological state in the years immediately prior to damages inquest); *Laurie Marie M. v. Jeffrey T.M.*, 159 A.D.2d 52, 57 (2d Dep't 1990) (citing evidence that the plaintiff was "dating" and noting "paucity of proof of permanent psychological damages"), *aff'd*, 77 N.Y.2d 981 (1991). Certain of Trump's cases involved claims against a party other than the person who committed the sexual assault. *See Vargas v. Premiere Staff Agency*, No. 17 Civ. 4280, 2019 WL 10632865 (S.D.N.Y. July 18, 2019) (claim against employer for discrimination where sexual assault had been committed by nonparty), *report and recommendation adopted*, 2020 WL 5663412 (S.D.N.Y. Sept. 23, 2020); *Miller v. State*, 110 A.D.2d 627 (2d Dep't 1985) (claim against university for negligence). And not one of the cases Trump cites involved evidence of injury covering a 25-year-plus period. That distinguishes Carroll's case from all of the cases on which Trump relies, and it was entirely reasonable for the jury to account for the harm that Carroll has experienced ever since the assault in 1996 in determining compensatory damages.

Carroll's case is also different because her trial happened in the present day. While Trump cites cases dating all the way back to 1985 as supposed comparators, our society's views on sexual assault and the attendant harms have changed significantly in recent years. In fact, this shift is the reason why the New York legislature enacted the Adult Survivors Act (ASA) in the first place, giving Carroll the opportunity to bring her battery claim. *See Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 185507, at *5–*9 (S.D.N.Y. Jan. 13, 2023). When it comes to evaluating a damages award, this shift cannot be ignored. That's because the jury serves as the "conscience of the community," *United States v. Gleason*, 616 F.2d 2, 15 (2d Cir. 1979), and "one of [its] most

important functions" is to "maintain a link between contemporary community values" and the courts, *Witherspoon v. State of Ill.,* 391 U.S. 510, 519 n.15, 88 S. Ct. 1770 (1968). Courts "must refrain from placing unreasonable restrictions on [a jury's] power to do so" through their award of compensatory damages. *Leather v. Ten Eyck*, 97 F. Supp. 2d 482, 488 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 145 (2d Cir. 2001); *see Breest*, 2023 WL 374404, at *4 (considering a shift in "public attitudes and reasonableness … regarding rape and sexual assault" in reviewing damages awarded by jury); *King v. Macri*, 800 F. Supp. 1157, 1164 (S.D.N.Y. 1992) (considering "a shift in societal attitudes" around police brutality). In other words, "[i]nsofar as the jury's award … reflects the more enlightened collective views of today, it should not be disregarded or minimized." *Breest*, 2023 WL 374404, at *4.

## II. THE DEFAMATION DAMAGES ARE NOT EXCESSIVE EITHER

### A. The Compensatory Damages Accurately Reflect the Evidence Presented at Trial

It has long been understood that "[i]n a libel case, more, perhaps, than in any other, the jury is generally considered to be the supreme arbiter on the question of damages." *Lynch v. N.Y. Times Co.*, 171 A.D. 399, 401 (1st Dep't 1916). "In actions for other torts there is generally some standard by which the reasonableness of an award of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part." *Yammine v. DeVita*, 43 A.D.3d 520, 521 (3d Dep't 2007) (cleaned up). Indeed, the law presumes damages arising from defamation *per se*, *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003), and juries are commonly instructed that defamation damages cannot be proven with "mathematical accuracy," *Ferri v. Berkowitz*, 561 F. App'x 64, 65 (2d Cir. 2014) (quoting N.Y. Pattern Jury Instr., Civil 3:29). Because the assessment of damages is "peculiarly within the jury's province," a court "must use prudence and restraint … in the exercise of its discretion over these

awards." *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 344 (S.D.N.Y. 2016) (omission in original).

Against this backdrop, the jury weighed the evidence to determine "fair and just compensation" for the injury to Carroll's reputation and "the humiliation and mental anguish in her public and private life" that Trump's October 2022 statement caused her to endure. Tr. 1433:2–5. To answer that question, the jury was instructed to consider: (1) Carroll's "standing in the community"; (2) the "nature of Mr. Trump's statement made about [her]"; (3) "the extent to which the statement was circulated"; (4) "the tendency of the statement to injure [her]"; and (5) "all of the other facts and circumstances in the case." *Id.* at 1433:5–11; *see Ferri*, 561 F. App'x at 65 (identifying these factors as bearing on defamation damages under New York law). Although cautioning that "[f]air compensation" for those harms "may vary," the Court told the jury that it could award a "substantial sum if you decide that there was substantial injury." Tr. 1433:12–15. And the jury heeded that guidance, deciding that Carroll's injury was substantial and awarding $2.7 million in compensatory damages to reflect that finding.

The jury's defamation damages award in no way requires remittitur or a new trial on damages. Trump's long list of grievances are riddled with factual misrepresentations and legal errors that neither individually nor collectively provide grounds for granting his motion. His arguments do not show that the jury verdict was "not supported by competent evidence" or that it "deviate[d] materially from approved awards in similar cases." *Osorio v. Source Enters., Inc.*, No. 05 Civ. 10029, 2007 WL 683985, at *10 (S.D.N.Y. Mar. 2, 2007). As a result, and for the following reasons, the Court should uphold the jury's compensatory damages award in this case.

*First*, a Rule 59 motion is not a vehicle to raise new legal or evidentiary arguments that could have been raised before. *See Fin. Cas. & Sur. Co., Inc. v. Zouvelos*, No. 12 Civ. 3476, 2018

WL 3950634, at *2 (E.D.N.Y. May 3, 2018) ("[A]rguments presented for the first time in a Rule 59(e) motion ordinarily are deemed forfeited."); *MJAC Consulting, Inc. v. Barrett*, No. 04 Civ. 6078, 2006 WL 2051129, at *3 (S.D.N.Y. July 24, 2006) ("[Defendant] failed to raise [] argument at trial and accordingly waived her right to assert it" in a Rule 59 motion) (collecting cases); *see also* Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2810.1 (3d ed.). Yet, that is precisely what Trump is trying to do. By attacking Professor Humphreys's analysis as supposedly full of facially implausible "error rates," faulty inputs, and glaring oversights, Trump asserts that any reliance on Humphreys's testimony to formulate a damages number could only mean that the jury itself had relied on "pure speculation." Trump Br. 18–22. Those are not proper Rule 59 arguments. Instead, they get at the core of Professor Humphreys's reliability as an expert, something Trump could have challenged under Federal Rule of Evidence 702 or raised on cross-examination. *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (listing these kinds of arguments as bearing on an expert's reliability under Rule 702). He chose not to. A motion under Rule 59 is not the opportunity for litigants to try their hand at new strategies when previous ones did not work out in their favor.

In any event, Trump's complaints about Professor Humphreys resemble arguments that he could have advanced through examination or made to a jury during summation; yet they are virtually absent from the three sentences his attorney dedicated to Professor Humphreys during his closing. Tr. 1330:7–18. None of them requires remittitur. For instance, Trump argues that Professor Humphreys's estimation that Trump's October 2022 statement was viewed between 1.5 million and 5.7 million times contains an "error rate of 74%" and therefore is "pure speculation." Trump Br. 20. He similarly faults the estimated costs for repairing Carroll's reputation. *Id.* at 21. But as Professor Humphreys testified, these estimate ranges were the byproduct of instituting

certain controls and assumptions through the modeling process based on the information available. *E.g.*, Tr. 1116:16–117:5, 1123:3–1125:11, 1141:10–13, 1141:17–20. Nothing prevented the jury from picking the number that reflected the assumptions it thought were reasonable. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 575 (S.D.N.Y. 2011) ("[I]t is well-established that the computation of damages is a quintessential fact issue for the jury, and that a jury need not accept an expert's damage calculations wholesale.") (collecting cases), *aff'd*, 838 F.3d 223 (2d Cir. 2016).

In other instances, Trump takes issue with what Professor Humphreys supposedly did not consider, like the "positive support" Carroll received after Trump defamed her. Trump Br. 20–21. But the jury was well aware of this positive support, and Professor Humphreys testified that, in her expert opinion, the existence of positive support says little about the cost of redressing the *negative* views that have been formed about an individual. Tr. 1134:25–1135:17. The jury was entitled to weigh that decision, and others Professor Humphreys made, in assessing her credibility as an expert. No argument that Trump offers suggests that the jury's credibility determinations were impermissible.[3]

*Second*, the jury did not award Carroll "double recovery" for harms stemming from Trump's 2019 defamatory statements. Trump Br. 18–19. For one, this is simply not a double recovery case within the meaning of the doctrine. As the cases Trump cites show, double recovery concerns the situation where a plaintiff presents two legal theories to account for the same injury. *Bender v. City of N.Y.,* 78 F.3d 787, 793 (2d Cir. 1996) ("If two causes of action provide a legal

---

[3] Tellingly, Trump asks for Carroll's reputation repair damages to be reduced to $368,000, the low end of Professor Humphreys's estimate. Trump Br. 18. It is unclear why Trump thinks that number would be accurate given all the flaws he supposedly finds in Humphreys's analysis. What it illustrates is that Trump simply wishes the jury had made a different choice among the options available to it. But he offers no legal reason for why the jury was required to side in his favor, nor could he.

theory for compensating one injury, only one recovery may be obtained."); *Phelan v. Loc. 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada*, 973 F.2d 1050, 1063–64 (2d Cir. 1992) (similar). That is entirely different from a situation where a plaintiff has two separate cases to address two separate injuries, the plaintiff tries one of them, and a jury awards her damages for that injury alone.

Nor is there any record support for the idea that the jury awarded Carroll reputational damages that predated the October 2022 statement anyway. To the contrary, the jury was expressly instructed not to consider those harms; Professor Humphreys was clear that her analysis and reputation repair budget did not incorporate those harms (and, as Trump elicited on cross, informed the jury that she created a separate report for *Carroll I*, Tr. 1148:5–13);[4] and the exhibits entered into the record to substantiate the harms Carroll incurred focused solely on events after October 2022, *see* Ex. 8 (PX-45, 46, 48, 51, 53, 57). Although the jury certainly heard testimony about Trump's June 2019 statements, that testimony was important to understanding the broader context of the case. The parties were in agreement on this point, and it was Trump's counsel who elicited much of the testimony about the June 2019 statements with which he now takes issue. *E.g.*, Tr. 331:21–332:10, 578:5–582:12, 606:12–20; *see also* ECF 144. Trump's counsel described as "perfect" the instruction that the Court ultimately gave to the jury about the related action. Tr. 537:13–538:7. There is no basis for Trump's claim now that the jury disregarded the Court's instructions. *See United States v. Williams*, 690 F.3d 70, 77 (2d Cir. 2012) ("We presume that jurors follow their instructions.").

---

[4] Professor Humphreys specifically testified that the damages range she calculated for *Carroll I* was much higher than the range she presented the jury in this case, contradicting the notion that the jury relied on those damages in reaching a number in this case that is less than the upper end of the budget that Professor Humphreys developed for *Carroll II*. Tr. 1158:12–23.

*Third*, the jury's finding that Trump did not "rape" Carroll as that term is defined under New York law does not undermine that same jury's determination of appropriate compensatory damages for Trump's defamatory statement. Until now, Trump has agreed that they were distinct issues. The Court instructed the jury that, for the purposes of the defamation analysis, "whether Trump's statement is false or true depends largely or entirely on whether you find that Trump raped or sexually abused or forcibly touched or otherwise sexually attacked Carroll." Tr. 1431:2–6. Trump did not object to this jury instruction during the charge conference, Tr. 1211:5–1213:15, and his own proposed verdict form, setting forth three distinct ASA predicates for Carroll's battery claim, enabled the jury to reach the very outcome that the jury did here, ECF 101. But now, in his brief and elsewhere, Trump tries to walk it all back. He asserts that the portions of his October 2022 statement that concern the underlying assault cannot be defamatory—and therefore cannot contribute to the compensatory damages award—because the jury found that he "sexually abused" Carroll rather than "raped" her. Trump Br. 18–19.

This argument is baseless as both a legal and factual matter. Rule 51 "requires parties to articulate and lodge their objections to jury charges before they are delivered so that 'the trial court [will have] an opportunity to cure any defects in the instructions before sending the jury to deliberate.'" *ING Glob.*, 757 F.3d at 97 (quoting *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 200 (2d Cir. 2004)). "Permitting a party out of compliance with Rules 50 [or] 51 to prevail under Rule 59(e) would render those Rules, which are basic to the conduct of federal trials, essentially superfluous." *Id.* Yet, that's the result Trump seeks here. The Court instructed, and the parties agreed, that the jury could award Carroll defamation damages no matter the ASA predicate offense on which it decided to rely for battery. Trump cannot backtrack from that simply because he dislikes the damages the jury ultimately decided to award.

In any event, Trump's argument has no grounding in fact. Trump's defense has never been that he forcibly inserted his fingers in Carroll's vagina without her consent but did not insert his penis, which is what his argument presupposes. He has insisted that nothing, at all, ever happened between him and Carroll. The jury saw through that lie, finding that Carroll's account was supported by clear and convincing evidence. In other words, that there was "no real substantial doubt" in the jury's mind that Trump had lied when he denied that *anything* happened. Tr. 1439:10–11. Taking Trump's October 2022 statement according to "the ordinary meaning of its words," *id.* at 1430:25–1431:1, it is clear that Trump was denying the entire encounter, not a narrow and technical *ex post* categorization of it. That denial rightfully contributed to the jury's defamation determination.

*Fourth*, the jury's damages award does not materially deviate from approved awards in similar cases. Trump is a former President of the United States. Because of this, he has one of the biggest platforms in the world. Nearly every statement he makes is circulated widely—in the press, across social media, and on television. His October 2022 statement was no exception. The jury heard Trump say during his deposition testimony that he posted the October 2022 statement on Truth Social and made sure that the press covered it. Ex. 6 at 127:14–20. Trump had almost five million followers on Truth Social at the time. Tr. 1116:11–12. That platform and Trump's media outreach enabled Trump's statement to generate between 13 and 18 million impressions across various channels of communication, of which between 3.7 and 5.6 million were to people likely to be receptive to his message. *Id.* at 1134:13–15. Professor Humphreys estimated that Carroll, as a result, would have to pay between $368,000 and $2.7 million to repair her reputation in the eyes of those who believed Trump. *Id.* at 1141:17–21. Carroll herself testified about the acute and overwhelming humiliation that comes from the former *President* branding you a liar, and from his

supporters repeating those same claims again and again with impunity. All of these factors together contributed to significant harms that Carroll experienced at the hands of the man who sexually abused her—a conclusion the jury found was supported by the weight of the evidence and deserving of a $2.7 million compensatory damages award.

None of the cases Trump relies on in his analysis is comparable to this case. *See* Trump Br. 16–17. One concerned a local magazine article published in 1987, prior to when the internet made such defamatory publications far more accessible. *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987). Others concerned a tenant's comments about her landlord on a local television show, *Jalal v. Shanahan*, No. 16 Civ. 281, 2018 WL 10466837, at *6 (E.D.N.Y. May 10, 2018), a defamatory letter sent to an employer and some undefined online "postings," *Xiaokang Xu v. Xiaoling Shirley He*, 147 A.D.3d 1223, 1224 (3d Dep't 2017), a statement where there was "no evidence that the statement was widely disseminated" and was heard "perhaps only one person," *Allen v. CH Energy Grp., Inc.*, 58 A.D.3d 1102, 1104 (3d Dep't 2009), and false criminal charges reported in a "local newspaper," *Strader v. Ashley*, 61 A.D.3d 1244, 1247 (3d Dep't 2009).

These cases and the others relied on by Trump do not compare in the slightest to being defamed by one of the loudest voices in the world, in a statement read by millions and millions of people, which described you as a liar, labeled your account of a forcible sexual assault a "hoax," and accused you of making up a horrific accusation to sell a "really crummy book." Diminishing those unique facts to place them in the same ballpark as the cases Trump cites would be a category mistake. Indeed, courts have upheld larger awards on less egregious facts than the one awarded here. *E.g.*, *Osorio*, 2007 WL 683985, at *6, *10 ($3.5 million; statement in an interview by an board member of an article in which he said the editor-in-chief had engaged in extortion); *Purgess v. Sharrock*, 33 F.3d 134, 140 (2d Cir. 1994) ($3.5 million; hospital defamed doctor by publishing

24

a formal report about his care that contained falsehoods and sending that report to the medical board); *see also Cantu v. Flanigan*, 705 F. Supp. 2d 220, 226–31 (E.D.N.Y. 2010) ($150 million; farce legal complaint in which defendant described plaintiff as an operations manager of a racketeering enterprise who was involved with drug cartels and at one point had conspired with Saddam Hussein).

### B.    The Punitive Damages for Defamation Are Proportional and Reasonable

Trump's punitive damages argument is not serious. By all relevant metrics, the jury's punitive damages award of $280,000 is well within reason and far from excessive. In reviewing punitive damages awards, courts consider three "guideposts": (1) "'the degree of reprehensibility' associated with the defendants' actions; (2) 'the disparity between the harm or potential harm suffered' and the size of the punitive award; and (3) the difference between the remedy in this case and the penalties imposed in comparable cases." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589 (1996)). All three weigh decisively in Carroll's favor here.[5]

On the first, the evidence at trial firmly established that Trump acted with substantial malice in defaming Carroll and that he knew his October 2022 statement was false. This conduct was neither innocent nor negligent—the jury found that it was malicious, calculated, and carried out with the intent to harm Carroll, a person Trump sexually abused decades prior. Trump himself admitted that he took steps to disseminate his false claims about Carroll to millions upon millions of people. Therefore, the degree of reprehensibility is high. *See Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021) (citing *Gore*, 517 U.S. at 575–76, 116 S. Ct. 1589). Trump's claim that his

---

[5] Trump cites a footnote in a Third Circuit decision for the proposition that the third guidepost is irrelevant to defamation verdicts. Trump Br. 22 (citing *Jester v. Hutt*, 937 F.3d 233, 241 n.1 (3d Cir. 2019). But that is not the law that courts apply in this Circuit. *See, e.g.*, *Webber v. Dash*, 607 F. Supp. 3d 407, 418 (S.D.N.Y. 2022).

conduct is "barely reprehensible" is premised on a version of the facts in which he was vindicated by the verdict, not the actual facts as found by the jury. *See* Trump Br. 23.

Turning to the second, Trump's argument as to the appropriate ratio of damages is frivolous. "Cases in which punitive damages are challenged as excessive typically, although certainly not always, are ones in which the amount of punitive damages awarded exceeds the amount of compensatory damages awarded." *Webber*, 607 F. Supp. 3d at 417. The cases Trump relies on demonstrate this principle. *See* Trump Br. 22 (arguing, without irony, for "a ratio of 1:1 or less"). But far from exceeding the compensatory damages here, the punitive damages constitute only 10.37% of the compensatory damages that the jury awarded. Plainly, a 10:1 ratio "does not raise concerns of excessiveness." *Ravina v. Columbia Univ.*, No. 16 Civ. 2137, 2019 WL 1450449, at *14 (S.D.N.Y. Mar. 31, 2019).

Finally, courts have upheld far larger punitive damages awards in cases where the "extent, scope, nature, and dissemination of the defamatory statements" were narrower and less egregious than with Trump's defamatory statement here. *See Bouveng*, 175 F. Supp. 3d at 351 (total of $4,000,000 in punitive damages against three defendants, where online statements appeared for ten months on website that was visited by 50,000 separate viewers each month); *Rombom v. Weberman*, No. 1378/00, 2002 WL 1461890, at *9–*11 (N.Y. Sup. Ct., Kings Cty. June 13, 2002) ($500,000 in punitive damages where defendant posted statements on several internet websites), *aff'd*, 766 N.Y.S.2d 88 (2d Dep't 2003); *Purgess*, 33 F.3d at 143 ($500,000 in punitive damages where hospital knowingly published false statements about associated doctor). At bottom, there is nothing excessive, shocking, or unreasonable about the jury's award of punitive damages to Carroll.

# CONCLUSION

For the foregoing reasons, the Court should deny Trump's motion for a new trial or remittitur.

Dated: New York, New York
          June 22, 2023

Respectfully submitted,

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

E. JEAN CARROLL,                                    Civil Action No.:
                                                    22-cv-10016
                          *Plaintiff*,

        – against –

DONALD J. TRUMP,

                          *Defendant*.
-------------------------------------------------------------------X

---

**DEFENDANT DONALD J. TRUMP'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION FOR A NEW TRIAL OR REMITTITUR**

---

TACOPINA, SEIGEL & DeOREO
275 Madison Ave., Fl. 35
New York, New York 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
Counsel for Defendant Donald J. Trump

## TABLE OF CONTENTS

INTRODUCTION....................................................................................................................1

ARGUMENT..........................................................................................................................1

      POINT I      THE COURT SHOULD GRANT A NEW TRIAL OR REMITTITUR
                     PURSUANT TO FED. R. CIV. P. 59................................................................1

             A.      COMPENSATORY DAMAGES FOR THE BATTERY CLAIM.................1

             B.      COMPENSATORY DAMAGES FOR THE DEFAMATION CLAIM.........3

             C.      PUNITIVE DAMAGES FOR THE DEFAMATION CLAIM.......................6

CONCLUSION......................................................................................................................7

# TABLE OF AUTHORITIES

## CASES:

*Alla v. Verkay*, 979 F. Supp. 2d 349 (E.D.N.Y. 2013).....................................................4

*Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34 (2d Cir. 2015).............................4

*Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280 (S.D.N.Y. 2016)..........................................6

*Breest v. Haggis*, 180 A.D.3d 83 (1ˢᵗ Dep't 2019)..........................................................2

*Breest v. Haggis*, No. 161137/2017, 2023 WL 374404
(Sup. Ct. NY Co. Jan. 24, 2023)..........................................................................1-2

*Cantu v. Flanigan*, 705 F. Supp. 2d 220 (E.D.N.Y. 2010)..............................................5-6

*Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573
(S.D.N.Y. 2011)................................................................................................4

*Egan v. Gordon*, No. 904231-20 (Sup. Ct. Albany Co. Nov. 10, 2022).................................2

*Fin. Cas. & Sur. Co., Inc. v. Zouvelos*, No. 12CV3476AMDRLM, 2018
WL 3950634 (E.D.N.Y. May 3, 2018).....................................................................3

*Grant v. City of Syracuse,* 357 Supp. 3d 180 (N.D.N.Y. 2019).........................................1

*In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, No. 1:00-1898, 2008
WL 1971538(S.D.N.Y. May 7, 2008).......................................................................3

*MJAC Consulting, Inc. v. Barrett*, No. 04 CIV. 6078(WHP), 2006
WL 2051129 (S.D.N.Y. July 24, 2006).....................................................................3

*Ortiz v. New York City Hous. Auth.*, 22 F. Supp. 2d 15
(E.D.N.Y. 1998)...............................................................................................2

*Osorio v. Source Enterprises, Inc.*, No. 05 CIV. 10029 (JSR), 2007 WL 683985
(S.D.N.Y. Mar. 2, 2007*)......................................................................................5

*Purgess v. Sharrock*, 33 F.3d 134 (2d Cir. 1994)........................................................5

*Rombom v. Weberman*, No. 1378/00, 2002 WL 1461890
(Sup. Ct. Kings Co. June 13, 2002).....................................................................6-7

*Stampf v. Long Island R. Co.*, 761 F.3d 192 (2d Cir. 2014).............................................................4

## STATUTES/RULES

Fed. R. Civ. P. 59.................................................................................................................1, 7

New York's Adult Survivor's Act....................................................................................................4

iii

**INTRODUCTION**

Defendant Donald J. Trump ("Trump" or "Defendant"), by and through his undersigned counsel, respectfully submits this Reply Memorandum of Law in further support of his Motion for a new trial or remittitur pursuant to Fed. R. Civ. P. 59.

**ARGUMENT**

**POINT I**

**THE COURT SHOULD GRANT A NEW TRIAL OR REMITTITUR
PURSUANT TO FED. R. CIV. P. 59**

**A.** **Compensatory Damages for the Battery Claim**

In her opposition papers, Plaintiff argues that the Court should not reduce the compensatory damages for the battery claim because a loss of consortium claim does not apply to her, and that the damages awarded in the cases that she cites support such compensatory damages.

As to a loss of consortium claim, Defendant is not arguing that Plaintiff alleged a loss of consortium claim but argues that her alleged damages are identical to plaintiffs in other cases asserting such a claim, namely that Plaintiff argued to the Jury that she should be compensated for living a life since early 1996 without companionship: "What is the price for decades of living alone without companionship, for having no one to cook dinner with, no one to walk your dog with, no one to watch TV with, and for feeling for decades like you are dirty and unworthy?" (Tr. 1272:22 - 1273:1); *see also Grant v. City of Syracuse*, 357 F. Supp. 3d 180, 195 (N.D.N.Y. 2019)(holding that damages for loss of consortium "includes such items as loss of support services, companionship, society, sexual relations, and solace").

Additionally, the cases cited by Plaintiff are distinguishable. In *Breest v. Haggis*, No. 161137/2017, 2023 WL 374404, at *3 (Sup. Ct. NY Co. Jan. 24, 2023)(*see also* Plaintiff Exhibit 7),

1

the Plaintiff was raped, diagnosed with PTSD and most traumatized ("worst part" of the rape) by the defendant "jamming his penis into her throat repeatedly and her gagging."[1] These facts clearly make *Breest* inapplicable here since Defendant did not rape Plaintiff or force oral sex upon her, and Plaintiff was not diagnosed with *any* medical condition.

In *Egan v. Gordon*, No. 904231-20 (Sup. Ct. Albany Co. Nov. 10, 2022), the plaintiff was raped and diagnosed with PTSD, and her career was "upended by the abuse she suffered." *Breest*, 2023 WL 374404, at *3 (the Court in *Breest* summarized the facts of the *Egan* case). Here, Plaintiff was not raped, was not diagnosed with any injury, and Plaintiff does not even argue that the battery had an effect on her career.

In *Ortiz v. New York City Hous. Auth.*, 22 F. Supp. 2d 15, 19, 38 (E.D.N.Y. 1998), Plaintiff "was raped at gunpoint in the stairwell of her building" and "diagnosed ... with chronic post-traumatic stress disorder, which condition [was] not abated in the four years" of treatment by her psychiatrist. Those facts are in no way similar to the facts of this case.

Therefore, the cases cited by Defendant – including multiple from the last few years – are clearly applicable and support Defendant's position that Plaintiff's compensatory damages award for her battery claim is excessive.

Consequently, the Jury's $2 million award was clearly motivated by sympathy rather than by evidence of harm, and the Court should grant a new trial as to compensatory damages for the battery claim, or grant a remittitur of such award to an amount no more than $400,000.

---

[1] Plaintiff Ex. 7 at 1210:17-22; *see also id.* at 364:17-19; *Breest v. Haggis*, 180 A.D.3d 83, 86 (1st Dep't 2019)("defendant eventually forced plaintiff to give him oral sex; then he digitally penetrated her and commented that she was "nice and tight"; then he raped her").

## B. Compensatory Damages for the Defamation Claim

Plaintiff first asserts that Defendant cannot now argue that the testimony of Plaintiff's damages expert (Professor Humphreys) was based upon faulty analysis because Defendant did not raise that issue at trial and attempt to exclude it. The Court should reject such assertion because, to the extent an expert's testimony is not convincing, that is an issue of weight and not admissibility. *See, e.g., In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, No. 1:00-1898, 2008 WL 1971538, at *10 (S.D.N.Y. May 7, 2008)("Defendants raise two principal objections to the reliability of Huggins' opinion: he does not use a proper methodology, and his conclusions are speculative. .... The concerns defendants raise go to the weight to be accorded his testimony rather than its admissibility.").

Furthermore, during the trial, Defendant cross-examined Professor Humphreys concerning the issues of Plaintiff being allegedly damaged by Defendant's June 2019 Statements and Professor Humphreys's failure to distinguish any harm from the October 12, 2022 Statement from any harm caused by the June 2019 Statements. (Defendant Ex. B at 148:8 - 1150:3; 1152:13-18). Defendant also cross-examined Professor Humphreys on the issue of her estimate of damages being speculative because she did not "know exactly who may have seen the" October 12, 2022 Statement (which was on social media), and did not factor in the effects of traditional media (newspapers and television) or Plaintiff's book on Plaintiff's reputation. (*Id.* at 1150:12-23; 1152:19 - 1153:8-15). Such cross-examination also focused on the fact that Professor Humphreys was aware of, but did not measure, the significant amount of positive support that Plaintiff received from the public. (*Id.* at 1154:3-20). Therefore, Defendant clearly raised Professor Humphreys's faulty analysis at trial.[2]

---

[2] Additionally, the cases cited by Plaintiff on this point are inapposite. In *Fin. Cas. & Sur. Co., Inc. v. Zouvelos*, No. 12CV3476AMDRLM, 2018 WL 3950634, at *2 (E.D.N.Y. May 3, 2018), the Court did not hold that the movant waived any argument and its language on this issue was dicta. In *MJAC Consulting, Inc. v. Barrett*, No. 04 CIV. 6078(WHP), 2006 WL 2051129, at *3 (S.D.N.Y. July 24, 2006), the movant raised arguments based upon facts not in the trial transcript, and here, Defendant bases all of his arguments on the trial transcript.

Moreover, Plaintiff does not even mention the holdings of cases cited by Defendant that establish that a Court should grant remittitur when the jury award is based upon speculative evidence. *See Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015)("[O]ur detailed assessment of the trial evidence bearing on damages convinces us that the jury's inclusion in its award of $900,000 for the lost developer's fee was impermissibly speculative."); *Stampf v. Long Island R. Co.*, 761 F.3d 192, 208 (2d Cir. 2014)(Reducing $100,000 of compensatory damages to $20,000 because the $100,000 award was based upon speculation); *Alla v. Verkay*, 979 F. Supp. 2d 349, 376 (E.D.N.Y. 2013)(granting remittitur because the "damages award [was] rooted in speculation"); *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 577 (S.D.N.Y. 2011)(granting remittitur because the compensatory damages award was "unduly speculative and would arguably constitute a 'windfall'").

As to Defendant's argument concerning double recovery, contrary to the Plaintiff's assertions, this is not a jury instruction issue. Plaintiff highlights the Court's jury instruction wherein the Court instructed the jury that it need not consider *Carroll I*. (Plaintiff Exhibit 1 at 537:13 - 538:7). However, that instruction does not concern Professor Humphreys testifying that Plaintiff was harmed by the June 2019 Statements but failing to separate that harm from any additional harm caused by the October 12, 2022 Statement.

As to Defendant's argument that the value of Plaintiff's defamation claim (Defendant allegedly defamed Plaintiff when he denied the rape) was significantly decreased by the Jury finding that no rape occurred, Plaintiff attempts to confuse the issue by citing to New York's Adult Survivor's Act ("ASA"). Merely because the ASA covers a groping of intimate parts (as well as rape) does not change the fact that the overall essence of Plaintiff's defamation claim was that Defendant allegedly defamed Plaintiff when he denied her rape allegation. (Complaint [Defendant Exhibit A] at ¶¶ 96 & 98). This is also not

a jury instruction issue because the Court's instruction highlighted by Plaintiff[3] goes to liability on the defamation claim, not to the amount of damages that should be awarded.

Lastly, the cases cited by Plaintiff do not support her position. In *Osorio v. Source Enterprises, Inc.*, No. 05 CIV. 10029 (JSR), 2007 WL 683985, at *10 (S.D.N.Y. Mar. 2, 2007), the Court upheld a $3.5 million defamation award because the defendant "'branded [plaintiff] as a criminal in the industry' and thereby impaired her ability to work in that industry." Here, Defendant did not accuse Plaintiff of criminal conduct, and she offered no proof that the October 12, 2022 Statement impaired her ability to work in her industry and blamed the June 2019 Statements (not the October 12, 2022 Statement ) for the loss of her position at Elle magazine. (Defendant Exhibit B at 268:20 - 269:19; 271:10-17; 271:18 - 273:10).

In *Purgess v. Sharrock*, 33 F.3d 134, 142 (2d Cir. 1994), the jury awarded Plaintiff $3.5 million for defamatory statements that caused a physician to lose $370,000 a year income, which is a far cry from the facts of this case.

In *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 227 (E.D.N.Y. 2010), the Court was faced with a $150 million award for "non-economic" injuries for "the loss of reputation, which includes the loss of professional status and the ability to earn wages." Due to the defamatory statements made against plaintiff, he suffered incredible harm to his ability to earn future income, including the loss of hundreds of millions of dollars of business:

> Cantu depended upon his reputation to secure large, multi-million dollar contracts, and stood to lose the ability to secure such contracts if his reputation were tarnished. The record indicates that such contracts were quickly lost when Cantu came under a cloud of suspicion for corrupt and fraudulent business practices. In fact, the record reveals that Georgala rescinded a contract valued at $289,950,000 due to the defamation, and that

---

[3] The jury instruction to which Plaintiff cites merely provides: "As you probably already have guessed, whether Mr. Trump's statement is false or true depends largely or entirely on whether you find that Mr. Trump raped or sexually abused or forcibly touched or otherwise sexually attacked Ms. Carroll." (Plaintiff Exhibit 1 at 1431:2-6).

Petroleos Mexicanos declined to enter into a contract valued at $69,000,000 due to the defamation. This indicates that the statements were particularly damaging to Cantu.

*Cantu*, 705 F. Supp. 2d at 229. Here, as noted above, to the extent that Plaintiff's income was diminished (and she testified that she made more money after losing her job at Elle[4]), such harm was caused by the June 2019 Statements and not the October 12, 2022 Statement.

Therefore, the Jury's $2.7 million award for Plaintiff's defamation claim was clearly motivated by sympathy rather than by evidence of harm, and the Court should grant a new trial as to compensatory damages for the defamation claim, or grant a remittitur of such award to an amount no more than $100,000 for general compensatory damages and $368,000 for the reputation repair campaign (the low end estimate for such a campaign according to Professor Humphreys).

## C.    __Punitive Damages for the Defamation Claim__

Plaintiff argues that the $280,000 punitive damages award for the defamation claim is appropriate because of the degree of reprehensibility. Here, Defendant submits that there is a very low degree of reprehensibility, if any, because, in the October 12, 2022 Statement, Defendant was defending himself against a false accusation of rape that was published and republished around the globe. Again, the Jury found that Defendant did not rape Plaintiff, and Plaintiff has always portrayed the Bergdorf Goodman Incident as nothing less than a rape. The purported sexual abuse found by the Jury could have only included alleged groping of Plaintiff's intimate parts through clothing, which is clearly not rape.

The cases cited by Plaintiff are also distinguishable. In *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 319 (S.D.N.Y. 2016), the defendants made 66 defamatory statements which accused plaintiff of extortion, visa fraud, bank fraud and prostitution. In *Rombom v. Weberman*, No. 1378/00, 2002 WL 1461890, at *1–2 (Sup. Ct. Kings Co. June 13, 2002), Defendant made multiple defamatory statements

---

[4] Defendant Exhibit B at 547:15-19 and 550:2-5.

6

accusing Plaintiff of being a dangerous psychopath and being confined to a mental institution as well as bombing government installations, kidnaping and serving time in prison. Here, we are faced with one defamatory statement, which Defendant made in an effort to defend himself against a false public accusation of rape, and such statement did not accuse Plaintiff of criminal activity.

Consequently, the Jury's $280,000 punitive damages award for Plaintiff's defamation claim clearly violated due process, and the Court should grant a new trial as to such punitive damages, or grant a remittitur of such award to an amount no more than $50,000.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant his Motion for a new trial or remittitur pursuant to Fed. R. Civ. P. 59 to the amounts set forth above, with such further and other relief as the Court deems just and equitable.

Dated: New York, New York
June 29, 2023

TACOPINA, SEIGEL & DeOREO

By: _____
Joseph Tacopina, Esq.
Chad Seigel, Esq.
Matthew G. DeOreo, Esq.
275 Madison Ave., Fl. 35
New York, New York 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com
mdeoreo@tacopinalaw.com
*Counsel for Defendant Donald J. Trump*

7